506 F.Supp. 187 (1980)
UNITED STATES of America et al., Plaintiffs,
v.
STATE OF WASHINGTON et al., Defendants.
Civ. No. 9213Phase II.
United States District Court, W. D. Washington.
September 26, 1980.
*188 *189 William A. White, Atty., Indian Resources Section, Land & Natural Resources Div., Dept. of Justice, Washington, D. C., George D. Dysart, Atty., Dept. of Justice, Land & Natural Resources Div., Portland, Or., for the U. S.
Alan C. Stay, Phillip E. Katzen, Evergreen Legal Services, Seattle, Wash., for Jamestown Band-Clallam, Lower Elwha, Muckleshoot, Nisqually, Nooksack, Port Gamble Band-Clallam, Samish, Sauk-Suiattle, Skokomish, Snohomish, Snoqualmie, Squaxin Island, Steilacoom, Stillaguamish, Suquamish and Upper Skagit Tribes.
Mason D. Morisset, Steven S. Anderson, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for Lummi, Makah, Quileute and Tulalip Tribes.
John Clinebell, Tacoma, Wash., William H. Rodgers, Jr., Seattle, Wash., for Puyallup Tribe.
Peter J. Wilke, Bellevue, Wash., for Swinomish Indian Tribal Community.
Joanne Eileen Foster, Taholah, Wash., for Quinault Tribe.
Alan C. Alhadeff, Alhadeff, Leavitt & Wesley, Seattle, Wash., for Dwámish Tribe.
James B. Hovis, Hovis, Cockrill & Roy, Yakima, Wash., for Yakima Indian Nation.
Daniel A. Raas, Bellingham, Wash., for Lummi Tribe.
Susan Kay Hvalsoe, Cullen, Holm, Hoglund & Foster, Olympia, Wash., for Hoh Indian Tribe.
Slade Gorton, Atty. Gen., Edward B. Mackie, Deputy Atty. Gen., State of Wash., Olympia, Wash., for State of Wash.
James M. Johnson, Sr. Asst. Atty. Gen., Dennis Reynolds, Asst. Atty. Gen., Dept. of Game, State of Wash., Olympia, Wash., for Departments of Fisheries and Game.
Charles E. Yates, Moriarty, Long, Mikkelborg & Broz, Seattle, Wash., for Reefnet Owners Assn.
Joseph T. Mijich, John P. World, Seattle, Wash., for Purse Seine Vessel Owners Ass'n, amicus curiae.

OPINION
ORRICK, District Judge.
This opinion constitutes but the most recent link in a long chain of opinions construing the following 27 words:
"The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory, * * *."[1]
The quoted clause appears in six treaties negotiated between the United States and several Pacific Northwest Indian tribes in 1854 and 1855.[2] The Indians traded their interest in the land west of the Cascade *190 Mountains and north of the Columbia River for the exclusive use of small land parcels (reservations), cash payments, and various guarantees, including, of prime importance in 1854-1855 as well as today, the right to continue fishing. In each of the seven cases where the Supreme Court has directly addressed the scope of the fishing clause in these treaties, it has "placed a relatively broad gloss on the Indians' fishing rights." Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 679, 99 S.Ct. 3055, 3071, 61 L.Ed.2d 823 (1979).[3]
This complex case, which was commenced in 1970 by the United States on its own behalf and as trustee of seven Indian tribes,[4] involves three key issues: (1) whether the treaties' fishing clause entitles the Indians to a specific allocation of the salmon and steelhead trout[5] in the "case area";[6] (2) if such allocation is required, whether hatchery-bred and artifically-propagated fish are included in the allocable fish population; and (3) whether the right of taking fish incorporates the right to have treaty fish protected from environmental degradation.
*191 The case has been litigated in two phases. In Phase I, which focused on the allocation issue, a series of trial and appellate court decisions culminated in a 1979 Supreme Court, opinion which conclusively established the tribes' treaty-based right to take the lesser of 50 percent of the "harvestable" case area fish or a sufficient quantity of fish to provide them with a moderate standard of living. United States v. State of Washington, 384 F.Supp. 312 (W.D.Wash. 1974) ("Final Decision I"), aff'd 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); United States v. State of Washington, 459 F.Supp. 1020 (W.D.Wash.1974-1978) ("Post-Trial Decisions"), various appeals dismissed, 573 F.2d 1117 (9th Cir. 1978), 573 F.2d 1118 (9th Cir. 1978), 573 F.2d 1121 (9th Cir. 1978), decisions at 459 F.Supp. 1020, 1097-1118 (W.D.Wash.1977-1978), aff'd sub nom. Puget Sound Gillnetters Ass'n v. United States District Court for the Western District of Washington, 573 F.2d 1123 (9th Cir. 1978), aff'd in part, vacated in part, and remanded sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 685-687, 99 S.Ct. 3055, 3074-3075, 61 L.Ed.2d 823 (1979) ("Washington  Phase I"). While retaining jurisdiction to ensure the implementation of the Phase I-decreed allocation, the Court here considers the hatchery and environmental issues which were raised in Phase I but reserved for decision in Phase II.[7] Currently pending are the parties' cross-motions for partial summary judgment on the hatchery issue and plaintiffs' motion for partial summary judgment on the environmental issue. Bound and informed by the numerous decisions heretofore rendered in this case, particularly the recent Supreme Court opinion, having found no genuine issue as to any material fact, and for the additional reasons set forth below, the Court concludes that plaintiffs are entitled to judgment as a matter of law on the hatchery issue and on that aspect of the environmental issue thus far presented for adjudication.

I
The treaties in question were negotiated between Isaac Stevens, the first Governor and first Superintendent of Indian Affairs of the Washington Territory, and tribal representatives. Few contemporaneous documents explicate the parties' intentions regarding the scope of and limitations on the tribes' fishing right. For the simple reason that fish were plentiful in 1854-1855 but have since become relatively scarce, the allocation, hatchery and environmental issues which all arise from the fact of scarcity were not addressed.[8] However, the extensive record developed in connection with this litigation and recounted in the many opinions issued to date provides considerable insight into the treaty negotiations. Preceding opinions have spelled out in impressive detail the parties' intentions and the surrounding circumstances, as well as relevant subsequent events; only a capsule summary is necessary here.[9]
When the treaties were negotiated, fish were the mainstay of the Indians' economy and the focal point of their culture. "All of [the otherwise-diverse tribes] shared a vital and unifying dependence on anadromous fish." Washington  Phase I, supra, 443 U.S. at 664, 99 S.Ct. at 3064. See also id. at *192 665-666, 99 S.Ct. at 3064-3065 and other Phase I opinions cited therein.[10]
An essential element of consideration for which the Indians bargained was the right to continue fishing as they had always done. "It is perfectly clear * * * that they were invited by the white negotiators to rely and in fact did rely heavily on the good faith of the United States to protect that right." Id. at 667, 99 S.Ct. at 3065.[11]
In 1854-1855, Indians constituted approximately 75 percent of the 10,000-person case area population and accounted for most of the fishing activity.[12] In 1974, Indians represented approximately 10.8 percent of case area's commercial fishermen[13] and they netted 2.4 percent of the commercial catch.[14] The dramatic decline in the Indians' case-area fishing activity is attributable to such factors as the settlement of the West by predominantly non-Indians and the industrialization of fishing and related activities,[15] acculturation of Indians into non-Indian forms of employment,[16] belated access of Indian fishermen to the salmon runs by virtue of the location of Indians' fishing sites,[17] and the discriminatory manner in which state officials have applied fishing laws and regulations to Indian fishermen.[18]
The most salient effect of Phase I was to reverse this trend and place Indian fishermen on an equal footing with non-Indians. In February, 1974, following a month-long trial and several months of post-trial briefing and argument, Judge Boldt held that the treaty language securing to the Indians "the right of taking fish * * * in common with all citizens" entitles them to up to 50 percent of the harvestable fish passing through the tribes' usual and accustomed fishing grounds. Final Decision I, supra, 384 F.Supp. at 343-344. The quantity of harvestable fish subject to the 50/50 allocation between Indians and non-Indians was to be computed by subtracting the following categories of fish from all those within the case area: (1) fish taken on, rather than off of, Indian reservations; (2) fish taken at off-reservation sites other than the tribes' usual and accustomed fishing grounds; (3) fish taken by the tribes for ceremonial and subsistence needs; and (4) fish not to be taken at all but to "escape" for spawning or conservation purposes. In addition, Judge Boldt called for an equitable adjustment augmenting the tribes' share because non-Indians take a "substantially disproportionate" number of the fish caught offshore that would otherwise have passed through the tribes' fishing grounds. Id. at 344. Finally, *193 Judge Boldt abstained from deciding whether hatchery-bred fish should be excluded from the allocable fish population. Id. at 344-345.[19] The Ninth Circuit affirmed Judge Boldt's allocation in all significant respects, modifying only the formula for computing the equitable adjustment. United States v. State of Washington, supra, 520 F.2d 676.[20] Initially, the Supreme Court denied certiorari. 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97. However, the Court later reviewed Judge Boldt's rulings when a conflict arose between the Washington state courts, which enjoined the State's Department of Fisheries ("Fisheries") from enforcing regulations designed to implement the allocation decision,[21] and the federal courts, which had decreed and undertook directly to implement the treatybased allocation.[22] The Court consolidated the state and federal court proceedings, affirmed and adopted Judge Boldt's construction of the treaties, and upheld, with slight modification, his allocation decision. Washington  Phase I, supra. The Court affirmed the Ninth Circuit's modification of the equitable adjustment formula, and further modified the computation of allocable fish by including: (1) fish taken on-reservation as well as those taken off-reservation; (2) fish taken off-reservation at sites other than the tribes' usual and accustomed fishing sites; (3) fish taken by the tribes for ceremonial and subsistence needs. Id., 443 U.S. at 687-688, 99 S.Ct. at 3075-3076. The Court amplified the 50/50 allocation ruling by emphasizing that the crucial determinant of the tribes' treaty share is that quantity of fish sufficient to provide a moderate standard of living, subject to a ceiling of 50 percent of the harvestable fish.
"[T]he 50% figure imposes a maximum but not a minimum allocation * * *. [T]he central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood  that is to say, a moderate living." Id. at 686, 99 S.Ct. at 3075.
See also Final Decision I, supra, 384 F.Supp. at 401-402. Finally, the Court noted that this Court had not yet reached a final decision on the hatchery issue and therefore expressed no opinion as to "whether the treaties give Indians the same right to take hatchery-bred fish as they do to take native fish." Id., 443 U.S. at 689 n.30, 99 S.Ct. at 3076 n.30.
*194 In August, 1976, several months after the Supreme Court denied certiorari in the first round of Phase I, the plaintiffs formally commenced Phase II by filing amended and supplemental complaints. The State responded with an answer and counterclaim. The issues were further refined through joint and separate statements of the issues to be resolved in Phase II. After considerable discovery and pretrial preparation, the plaintiffs moved for partial summary judgment on the issue "whether the federal treaty fishing right reserves to treaty tribes a right to have the fishery resource protected from adverse environmental actions or inactions of the State of Washington."[23] Excluded from the scope of the plaintiffs' motion, and not yet presented to the Court for resolution, are two subsidiary environmental issues: (1) whether, if such right exists, the State has violated it; and (2) what remedies, if any, are appropriate. After extensive briefing by all parties, the Court heard oral argument on May 11, 1979. The Supreme Court's opinion in the second round of Phase I was handed down two months thereafter, and the parties submitted additional briefs regarding the significance of that opinion in relation to the pending environmental issue.
Following a status conference in September, 1979, the parties filed cross-motions for summary judgment on the issue "whether the federal treaty fishing right includes all, some or no artificially-reared fish released into public waters."[24] Each party supported its motion with statements of facts and legal contentions, briefs, and affidavits[25] in accordance with the procedures outlined in Section 3.30 of the Manual for Complex Litigation. Oral argument took place on April 10, 1980, and, after the parties filed supplementary factual material, both the hatchery and the environmental issues were deemed submitted.

II
In analyzing the allocation issue in Phase I, it was possible to rely on the express language of the treaties, as well as the parties' intentions and surrounding circumstances, *195 in construing the treaties' fishing clause. In particular, the 50/50 allocation between treaty and nontreaty fishermen was derived from the "in common with" provision in that clause. Washington  Phase I, supra, 443 U.S. at 685-686, 99 S.Ct. at 3074-3075; Final Decision I, supra, 384 F.Supp. at 343. However, none of the express terms in the fishing clause pertain to the hatchery or environmental issues. Canons of interpreting Indian treaties accordingly assume especial significance in ascertaining the treaties' implicit meaning with respect to those issues.
Indian treaties must be interpreted so as to promote their central purposes. United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). They must be read "in light of the common notions of the day and the assumptions of those who drafted them." Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 206, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978). The Supreme Court has been notably attentive to the intentions and assumptions of the Indians as they entered into the treaties.
"[T]he United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. `[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.'" Washington  Phase I, supra, 443 U.S. at 675-676, 99 S.Ct. at 3069-3070, quoting in part from Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899).
See also Tulee v. Washington, 315 U.S. 681, 684-685, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942). Any ambiguities must be resolved in the Indians' favor; "the wording of treaties * * * with the Indians is not to be construed to their prejudice." Antoine v. Washington, 420 U.S. 194, 199, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975). See also Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970). The Supreme Court has repeatedly relied on the rule of attending to the Indians' common-sense understanding of the treaties "in broadly interpreting these very treaties in the Indians' favor." Washington  Phase I, supra, 443 U.S. at 676, 99 S.Ct. at 3070.

III

A
Prior to 1973, the State had never drawn a distinction in either its legal arguments or its fisheries programs between natural and hatchery-bred fish. The State initially proposed that distinction in oral argument before the Supreme Court in a case involving discriminatory state regulation of steelhead trout fishing in the Puyallup River. In the course of striking down the state regulation as impermissible infringement upon the Puyallup Tribe's treaty-based fishing right, the Supreme Court expressly reserved ruling on whether the existence of a license fee-funded hatchery program should affect the allocation of steelhead trout under the fishing clause. Department of Game v. Puyallup Tribe, 414 U.S. 44, 48, 94 S.Ct. 330, 333, 38 L.Ed.2d 254 (1973) ("Puyallup II").[26] *196 In a concurring opinion, three Justices suggested that the Indians' treaty right should not extend to hatchery fish subsidized by non-Indian sport fishermen. Id. at 49-50, 94 S.Ct. at 333-334.
On remand, the State courts converted that suggestion into a ruling. Department of Game v. Puyallup Tribe, No. 158069 (Super.Ct.1975), aff'd 86 Wash.2d 664, 548 P.2d 1058 (1976). Although the Puyallup litigation involved fishing by the Puyallup Tribe (but not the other 20 tribes that are parties to this litigation) for steelhead trout (but not the other five species of salmon that are the subject of this litigation) in the Puyallup River (but not the entire case area), the State moved to exclude all hatchery fish from the 50 percent treaty share to which Judge Boldt had declared all of the Indians in this case to be entitled. Judge Boldt then enjoined the State from extending the State court's holding beyond the Puyallup parties and subject matter. Post-Trial Decisions, supra, 459 F.Supp. at 1042 (following Pierce County Superior Court decision) and at 1072 (following Washington Supreme Court decision). When the State court's ruling was reviewed by the Supreme Court, the case was decided on other grounds and the Court again declined to address the hatchery issue. Puyallup Tribe v. Department of Game, 433 U.S. 165, 177 n.17, 97 S.Ct. 2616, 2623-2624 n.17, 53 L.Ed.2d 667 (1977) ("Puyallup III"). In short, none of the numerous federal opinions in the Puyallup trilogy addresses the merits of the hatchery issue; neither the governing law nor the applicable facts were discussed, much less adjudicated. See Post-Trial Decisions, supra, 459 F.Supp. at 1079 (Memorandum Decision and Order Granting Preliminary Injunction re Hatchery Propagated Fish). Throughout Phase I, which was litigated concurrently with Puyallup II and III, hatchery fish have been legally indistinguishable from natural fish.

B
Although the legal status of hatchery fish did not assume significance until 1973, the State's hatchery program has been in existence since 1895.[27] The hatchery activities of the Fisheries and Game Departments have steadily increased since that time, particularly in the more recent years.[28] Currently, the State operates 19 steelhead trout and 16 salmon hatcheries in the case area.[29] Another 16 facilities provide limited salmon production assistance.[30] The State-run facilities are funded by federal and local, as well as State, monies.[31]
*197 Additional hatcheries in the case area are operated by entities other than the State. Some facilities are sponsored by the United States Fish and Wildlife Service, some are sponsored by various tribal governments, and others are cooperative ventures between the State and tribes or private parties.[32]
An estimated 371,000,000 salmon and 8,755,000 steelhead trout were released into the State's waters from federal, State, tribal, and all other hatcheries during the 1978-1979 season (i. e., July 1978-June 1979).[33] Hatchery fish presently account for 60 percent of the steelhead and 17 percent of the salmon in the case area.[34] The relative size of the hatchery population varies considerably among the different salmon species; hatchery fish constitute as much as 63 percent of the chinook in the case area and there are virtually no hatchery-propagated pink and sockeye salmon.[35] Because salmon return to their native streams to spawn, the placement of hatcheries has a tremendous impact on the proportion of propagated and natural fish in each geographically distinct population.
Once released from hatchery facilities, artificially-bred fish mature and reproduce in the same manner as natural fish. Hatchery and natural stocks of the same species often occupy the same harvest management area at the same time.[36] Hatchery and natural fish generally resemble each other, although sophisticated techniques are being developed to attempt to differentiate between them.[37] Whether such techniques are reasonably accurate or economically feasible is not yet established.[38] In its motion for summary judgment, the State seeks to exclude from the population of allocable fish the "first generation" of hatchery-produced fish. Subsequent generations, who spend their entire life cycle in the natural environment, are undisputedly included in the tribes' treaty share.[39]

C
The Court concludes that all hatchery fish must be included in the computation of the tribes' treaty share in order to effectuate the parties' intent and the purposes of the fishing clause. The Supreme Court's recent reaffirmation of the long-standing view that the treaties were designed to guarantee the tribes an adequate supply of fish goes far toward resolving the hatchery issue.
"Governor Stevens and his associates were well aware of the `sense' in which the Indians were likely to view assurances of their fishing rights. During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and the Governor's promises that the treaties would protect the source of food and commerce were crucial in obtaining the Indians' assent. It is absolutely clear, as Governor Stevens himself said, that neither he nor the Indians intended that the latter `should be excluded from their ancient fisheries,' and it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians *198 out of any meaningful use of their accustomed places to fish." Washington  Phase I, supra, 443 U.S. at 676, 99 S.Ct. at 3070 (citations omitted).
The only express limitation on the tribes' right of taking fish is the requirement to share the harvest "in common with" non-Indians. The only implicit limitations on that right are the tribes' moderate living needs, the State's power to impose conservation measures necessary to preserve the resource, and the physical availability of fish. Id. at 686-689, 99 S.Ct. at 3075-3076; Final Decision I, supra, 384 F.Supp. at 401-402. No court has implied any additional limitations based on the species or origin of the fish, or the purpose, manner, or timing of the taking. Id.
It is now beyond dispute that natural fish have become relatively scarce, due at least in part to the commercialization of the fishing industry and the degradation of the fishing habitat caused primarily by non-Indian activity in the case area.[40] The record also establishes that the State has developed and promoted its artificial propagation program in order to replace the fish that were artificially lost. In 1977, the State described its hatchery program as follows:
"Salmon hatcheries * * * are a means of combating losses of fish life caused by environmental changes. They are an aid to crippled streams in producing fish, occasionally a substitute for them. Because of competitive water, land, and forest exploitation, it has been necessary to develop controlled methods of sustaining or rehabilitating the stocks of fish which inhabit fresh water streams."[41]
The mitigation purpose of the State's hatchery program has been echoed throughout its history. This statement by a Fisheries spokesman in 1946 typifies the statements and publications frequently issued by the State:
"The present purpose of the salmon hatchery is not to replace nature, nor to eliminate it, but to supplement the work of nature in places where the works of man have caused an unnatural situation which reduces the effectiveness of natural propagation. Hatcheries are intended to replace the production of streams destroyed by dams, diversions, pollution, or obstructions, and to build up the runs and streams that are not producing to full capacity."[42]
See also Post-Trial Decisions, supra, 459 F.Supp. at 1074, 1081 (hatcheries injunction). It is equally evident that hatchery fish represent an ever-increasing proportion of the total fish population in the case area. Whereas hatchery-bred steelhead trout accounted for 10 percent of all steelhead trout in 1950, their representation rose to 20 percent in 1960, 40 percent in 1970, and 60 percent in 1980.[43] According to the chief of the Game Department's Fisheries Management Division:
"Hatchery-reared winter-run steelhead make up a high percentage of the catch of steelhead in the state with some of the heavily planted rivers showing hatchery returns contributing up to 90% of the catch * * *. Overall it appears likely that hatchery steelhead will continue to contribute significantly to the harvests, while the numbers of wild fish will most likely decline."[44]
The inescapable conclusion is that if hatchery fish were to be excluded from the allocation, the Indians' treaty-secured right to an adequate supply of fish[45]  the right for *199 which they traded millions of acres of valuable land and resources  would be placed in jeopardy. The tribes' share would steadily dwindle and the paramount purpose of the treaties would be subverted. Contrary to what the Supreme Court held to be the parties' intentions, nontreaty fishermen would ultimately "crowd the Indians out of any meaningful use of their accustomed places to fish." Washington  Phase I, supra, 443 U.S. at 676-677, 99 S.Ct. at 3070.

D
None of the arguments advanced by the State calls for the exclusion of hatchery fish from the treaty allocation. First, the State focuses on the intentions of the negotiators. Proceeding on the accurate assumption that neither the Indians nor the federal officials conceived of artificial propagation facilities when the treaties were drafted in 1854 and 1855,[46] the State argues that the Indians' concepts of property rights were such that, if they had divined the advent of hatcheries, they would not have presumed to be entitled to State-funded hatchery fish. In short, the State contends that the tribes subscribed to the doctrine that one may claim the fruits of his own labor. The record establishes that the Indians recognized exclusive property interests in land and in sedentary resources.[47] However, the Indians viewed migratory fish and animals differently from stationary ones. The right to take fish existed when, and only when, the fish were within or passing through a tribe's particular territory.[48] Indians attempted to "enhance" their fish supply by religious means,[49] but there is no evidence that those who participated in enhancement activities attained any superior or exclusive interests in the fish for whose arrival they had prayed.[50]
The State attempts to bolster its interpretation of the parties' intent by referring to the shellfish proviso that was tacked onto the fishing clause:
"The right of taking fish * * * is further secured to said Indians, * * * Provided, however, That they shall not take shell fish from any beds staked or cultivated by citizens."
The State argues that the shellfish proviso illustrates the parties' intent to deny the Indians access to resources created or enhanced by non-Indian efforts. Again the State misperceives the tribes' notions of property law. As described above, Indians considered shellfish, as sedentary creatures, to be the exclusive province of the tribe *200 within whose territory they were located. Thus, the proviso imposed no limitation on the Indians' then-existing activities because only resident tribe members were entitled to take local shellfish. Rather, the function of the proviso was to enable non-Indian settlers to establish their own, exclusive ownership of shellfish beds and storage areas that might have otherwise belonged to the tribes.[51] The shellfish proviso carved an exception into the Indians' rule that a tribe had exclusive use of sedentary resources within its territory. It did not reflect the adoption of the conceptually-distinct rule, urged here by the State but not recognized in 1854-1855 by the Indians, that one who cultivates a resource thereby gains an exclusive ownership interest in it.
Next, the State focuses on the fact that the tribes' fishing right is a reserved, rather than a granted, right. That is, the treaties authorized the Indians to continue to exercise their preexisting right to take fish; they did not create new or additional fishing rights for the tribes. This characterization of treaty rights has long been established beyond cavil. See, e. g., United States v. Winans, supra, 198 U.S. at 381, 25 S.Ct. at 664, quoted approvingly in Washington  Phase I, supra, 443 U.S. at 680, 99 S.Ct. at 3071. The State invokes it here to claim that because hatcheries were neither in existence nor in the parties' contemplation when the treaties were signed, the Indians could not have reserved the right to take hatchery fish. This claim contravenes considerable case law and is directly refuted by Winans, the leading case on which the state relies regarding the nature of reserved rights.
In Winans, private parties constructed a state-licensed fish wheel on the Columbia River and thereby foreclosed the Yakima Indians from fishing at some of their usual and accustomed places. The Supreme Court held that it violated the fishing clause of the Treaty with the Yakimas (one of the treaties in issue here) for the non-Indians to use "modern" devices which have the effect of preempting the tribes' fishing right.
"New conditions came into existence, to which those [fishing] rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away. * * *
* * * In the actual taking of fish white men may not be confined to a spear or crude net, but it does not follow that they may construct and use a device which gives them exclusive possession of the fishing places." Winans, supra, 198 U.S. at 381-382, 25 S.Ct. at 664.
In Phase I of this case, the Supreme Court stated that "even more significant than the language in Winans is its actual disposition. * * * [I]t assured the Indians a share of the fish." Washington  Phase I, supra, 443 U.S. at 681, 99 S.Ct. at 3072. Clearly, the treaties reserved to the tribes more than a share of the 1854 and 1855 salmon runs; they also reserved the right to share in all future runs. In light of the fact that hatchery-bred fish constitute an ever-increasing proportion of the relatively-stable total catch, hatchery fish must be included in the tribes' allocation in order to "assure the Indians a share of the fish."
Finally, the State contends that it has regulatory and ownership interests in hatchery fish and that neither the treaties nor any subsequent enactment has preempted such interests. With respect to the State's asserted regulatory interest, it has been firmly established that the State's authority to regulate treaty fishing extends no further than the imposition of nondiscriminatory, necessary conservation measures. See Puyallup trilogy, supra; Final Decision I, supra, 384 F.Supp. at 333, 339, 342, 345-347, 401-403. The State has not claimed that it seeks to regulate the allocation of hatchery fish in order to conserve the resource. Rather, the State believes that because it provides funding for (at least part of) its hatchery program, its authority to regulate hatchery fish is not limited to conservation measures. The crux of the State's argument is that it has bought its way out of the obligation to respect the *201 tribes' treaty rights.[52] Both the premise and the conclusion of this argument are fallacious. First, the State's use of the term "regulate" is inappropriate. The State does not seek to control the time, manner, location, or extent of hatchery-fish fishing; it wishes to control the allocation of hatchery fish.[53] Second, it is too late in the day to challenge the fact, recently reaffirmed in Phase I, that the treaty governs the allocation of fish. Under the Supremacy Clause of the Constitution, the State is bound by the allocation decreed pursuant to the treaty. In the absence of a claim that hatchery fish must be excluded from the allocation in order to preserve the resource, the State's police powers are not implicated in the determination whether hatchery fish are "fish" for purposes of the treaty allocation.
Ultimately, the State is asserting an ownership interest in hatchery fish. This argument must fail as a matter of law. As the State concedes, the Supreme Court has flatly rejected the notion that a state owns fish swimming within its waters.
"`[T]o put the claim of the State upon title is,' in Mr. Justice Holmes' words, `to lean upon a slender reed.' A State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of `owning' wild fish, birds, or animals. Neither the State nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture." Douglas v. Seacoast Products, Inc., 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977) (citations omitted).
See also Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). The State invites this Court to limit Douglas and Hughes to natural fish and to reinstate with respect to hatchery fish the nineteenth-century rule that a state owns its public resources. Whatever merit the State's argument might have when applied to fish confined within hatchery facilities, it has no logical application to harvestable fish that have been released from such facilities and are freely swimming alongside naturally-bred fish in the State's rivers, streams, and bays. The State acknowledges that private hatchery owners have no ownership interest in fish released into public waters.[54] Both Douglas and Hughes counsel against the recognition of any ownership interests in the State with respect to hatchery fish that have been released from the State's possession.
The State attempts to overcome the import of Douglas and Hughes by relying on two recent takings cases. Its reliance is misplaced. In Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), and Vaughn v. Vermilion Corp., 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979), the Supreme Court held that when a private party builds channels on private property with private funds, the fact that such channels ultimately join with navigable waterways does not render the private channels subject to public access as if public waterways. These cases do not suggest that the investment of state funds in hatchery facilities would give rise to state ownership of hatchery-bred, but since-released, fish. First, the Court distinguished between privately-constructed projects that replace preexisting navigable waterways and those that do not involve the destruction and replacement of public waterways. Whereas a private ownership interest exists in the latter situation, the Court suggested that it might well not exist in the former situation. Vaughn, supra, 100 S.Ct. at 401. This case is more closely *202 analogous to the former situation, if it is in any way analogous to the waterways cases, because hatchery fish are produced in order to replace depleted natural stocks. Second, both Kaiser and Vaughn involved the relationship between private parties and the federal government for purposes of the Takings Clause. This case involves the relationship between a state and Indian tribes and no takings issue is present. Third, there is a significant difference between requiring a private property owner to grant the public access to his property after his improvements have been connected to public property, which the Supreme Court held in Kaiser and Vaughn could not be done without providing just compensation, and entitling a state to claim ownership of hatchery fish once they are released from a hatchery facility and swimming freely in public waters.
The legal conclusion that the State lacks an ownership interest in released hatchery fish is reinforced by the factual circumstances of this case. Although the State provides considerable funding for its hatchery program, it is undisputed that federal and local governments as well as private parties also contribute to the construction and operation of State-run hatcheries.[55] In addition, the State's hatcheries supply only a portion of the hatchery fish population; federal, tribal, private, and cooperative (State-private, State-tribal) hatcheries account for approximately 25 percent of the hatchery-bred steelhead and 22 percent of the hatchery-bred salmon in the case area.[56] It would be inequitable and contrary to the spirit and intent of the treaties were the State-produced hatchery fish to be exempt from the treaties' "in common with" sharing requirement while hatchery fish supported by tribal and federal funds would be divided equally between the tribes and all other State citizens.
Moreover, the inclusion of hatchery fish in the allocation need not affect nontreaty fishermen adversely. The Supreme Court plainly stated that the measure of the tribes' treaty share is that quantity of fish sufficient to provide them with a moderate standard of living, subject to a maximum share of 50 percent of the total catch. Washington  Phase I, supra, 443 U.S. at 686-687, 99 S.Ct. at 3075. For every hatchery fish taken to satisfy the tribes' moderate living needs, an additional natural fish is available to the nontreaty fishermen. Under the moderate needs test, inclusion of hatchery fish would alter the composition but not the size of the tribes' allocation. In conclusion, the Court holds that hatchery fish are "fish" within the meaning of the treaties' fishing clause and consequently are subject to allocation thereunder.

IV

A
From the numerous opinions rendered in Phase I, and the application of the principles enunciated therein to the hatchery issue, flows the resolution of the remaining issue in Phase II  the environmental issue. As previously noted, the only aspect of this issue presently before the Court is the legal question whether the tribes' fishing right includes the right to have treaty fish protected from environmental degradation. Plaintiffs' pending motion for partial summary judgment does not reach the additional questions whether the State is violating the tribes' alleged environmental right and what relief may be warranted.[57] This motion was briefed and argued prior to the issuance of the Supreme Court's Phase I decision, which essentially rejected the principal assumptions underlying the State's arguments here.
*203 At the outset, the Court holds that implicitly incorporated in the treaties' fishing clause is the right to have the fishery habitat protected from man-made despoliation. Virtually every case construing this fishing clause has recognized it to be the cornerstone of the treaties and has emphasized its overriding importance to the tribes. See Washington  Phase I, supra, 443 U.S. at 664-667, 675-681, 99 S.Ct. at 3063-3065, 3069-3072, and cases cited therein. The Indians understood, and were led by Governor Stevens to believe, that the treaties entitled them to continue fishing in perpetuity and that the settlers would not qualify, restrict, or interfere with their right to take fish. Final Decision I, supra, 384 F.Supp. at 334, 355-357.
The most fundamental prerequisite to exercising the right to take fish is the existence of fish to be taken. In order for salmon and steelhead trout to survive, specific environmental conditions must be present. A fisheries study prepared jointly by the State and the federal government identifies at least five such conditions: "(1) access to and from the sea, (2) an adequate supply of good-quality water, (3) a sufficient amount of suitable gravel for spawning and egg incubation, (4) an ample supply of food, and (5) sufficient shelter."[58] It is undisputed that "alteration of even one of these essential, finely-balanced requirements will affect the production potential."[59] It is also undisputed that these conditions have been altered and that human activities have seriously degraded the quality of the fishery habitat.
"Over the years, there has been a gradual deterioration and loss of natural fish production habitat in Washington State streams. Although there are many individual factors contributing to this, the general trend toward reduced production habitat is more the result of a combination of activities performed by man  activities which alter and destroy one or more habitat conditions required for successful fish production. Generally, these factors can be categorized under the broad headings of watershed alterations, water storage dams, industrial developments, stream channel alterations, and residential developments.
* * * * * *
A century ago, salmon abounded in the Pacific Northwest. Almost every accessible area, even in the deep interior, nurtured crops of salmon which renewed themselves as they had for millennia. However, in the Twentieth Century the urbanization and intensive settlement of the area, the rapid development of water power, lumbering and irrigation and the pollution of the watersheds reduced the quality and amount of accessible spawning grounds. These activities also reduced the rearing capacity of the streams."[60]
Were this trend to continue, the right to take fish would eventually be reduced to the right to dip one's net into the water... and bring it out empty. Such result would render nugatory the nine-year effort in Phase I, sanctioned by this Court, the Ninth Circuit, and the Supreme Court, to enforce the treaties' reservation to the tribes of a sufficient quantity of fish to meet their fair needs. The Supreme Court all but resolved the environmental issue when it expressly rejected the State's contention, initially reiterated on this motion, that the treaty right is but an equal opportunity to try to catch fish. Rather, the Court held that the treaty assures the tribes something considerably more tangible than "merely the chance * * * occasionally to dip their nets into the territorial waters." Washington  *204 Phase I, supra, 443 U.S. at 679, 99 S.Ct. at 3071.[61]
The Supreme Court similarly disposed of the State's argument that when the tribes signed the treaties, they bargained for both the costs and the benefits of economic development. The State suggests that the tribes entered the treaty negotiations with the understanding that the United States was encouraging non-Indian settlement of the West, that non-Indians would commercially develop the natural resources, and that the United States intended to diversify the Indian economy and acculturate the Indians into the non-Indian way of life.[62] To the contrary, it is well established that the treaty negotiators specifically assured the tribes that they could continue to fish notwithstanding the changes that the impending western expansion would certainly entail.
"These people [Governor Stevens and his advisers] recognized the vital importance of the fisheries to the Indians and wanted to protect them from the risk that non-Indian settlers might seek to monopolize their fisheries." Washington  Phase I, supra, 443 U.S. at 666, 99 S.Ct. at 3064.
It has been stated repeatedly that neither party to the treaties, nor their successors in interest, may act in a manner that destroys the fishery. See, e. g., United States v. State of Washington, supra, 520 F.2d at 685; Final Decision I, supra, 384 F.Supp. at 401-402; Confederated Tribes of the Umatilla Indian Reservation v. Alexander, 440 F.Supp. 553 (D.Or.1977) ("Umatilla"). In Umatilla, a fishing clause substantially identical to those in question here was held to bar the construction of a dam which would have flooded some Indian fishing stations, prevented all wild fish from swimming upstream, and completely eliminated the steelhead run above the dam. Nothing short of an express congressional directive could impair the tribes' fishing right. Id. at 555. Conversely, the Supreme Court ruled in Puyallup III that the State's conservation-oriented regulation must be applied to on as well as off-reservation fishing because otherwise the tribes might frustrate other citizens' exercise of their fishing right. Puyallup III, supra, 433 U.S. at 176-177, 97 S.Ct. at 2623. The only significant difference between the holding here and prior decisions is that the general rule that neither party may impair the other's fishing right is applied to the particular situation of impairment by environmental degradation rather than by physical device,[63] by otherwise-burdened access to the fishery,[64] by discriminatory regulation,[65] or by discriminatory application of neutral regulations.[66]
The conclusion that the treaty-secured fishing right incorporates an environmental right is consonant with the implied-reservation-of-water doctrine that is often employed in the construction of Indian treaties. In Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), the seminal case in this area, the Supreme Court held that when the treaty creating the Fort Belknap Indian Reservation was signed, the parties impliedly reserved a sufficient quantity of water to irrigate the arid reservation land. Without that water, the purpose of creating the Reservation  to enable the tribe to give up its nomadic existence *205 and sustain itself on a relatively small tract of land  would be incapable of fulfillment. Id. at 576, 28 S.Ct. at 211. Thus, the construction of dams or reservoirs or the undertaking of any other activities that would prevent water from flowing to the Reservation was enjoined. See also United States v. New Mexico, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); Cappaert v. United States, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976); Arizona v. California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). For present purposes, there are two notable limitations on the implied-reservation-of-water doctrine. First, water rights may be implied only "[w]here water is necessary to fulfill the very purposes for which a federal reservation was created," and not where it is merely "valuable for a secondary use of the reservation." New Mexico, supra, 438 U.S. at 702, 98 S.Ct. at 3015. However, so long as water rights are necessary to exercise expressly-reserved rights, they arise by implication regardless of the equities that may favor competing water users. Cappaert, supra, 426 U.S. at 138-139, 96 S.Ct. at 2069. Second, the scope of the implied right is circumscribed by the necessity that calls for its creation. The doctrine "reserves only that amount of water necessary to fulfill the purpose of the reservation, no more." Id. at 141, 96 S.Ct. at 2070.
In this case, there can be no doubt that one of the paramount purposes of the treaties in question was to reserve to the tribes the right to continue fishing as an economic and cultural way of life. It is equally beyond doubt that the existence of an environmentally-acceptable habitat is essential to the survival of the fish, without which the expressly-reserved right to take fish would be meaningless and valueless. Thus, it is necessary to recognize an implied environmental right in order to fulfill the purposes of the fishing clause. Indeed, courts have already recognized implied water rights for the specific purpose of preserving fish. In both Cappaert, supra, and United States v. Anderson, No. 3643 (E.D.Wash., July 23, 1979), the unimpaired flow of sufficient quantities of water was held to be necessary for the protection of fish located in a national monument and an Indian reservation. Here, plaintiffs claim that the treaties impliedly reserved water of sufficient quality to sustain the salmon and steelhead trout which they have the expressly-reserved right to take. The recognition of that implied right is no less necessary here than in Cappaert or Anderson. In fact, the fishing clause is even more crucial to the purposes of the treaties here in question than were the fish-related clauses in those cases.
The State argues at some length that it is not necessary to imply an environmental right because there currently exist numerous federal and State programs designed to protect the fish habitat. There is no dispute regarding the existence, as opposed to the effectiveness, of those programs. However, the fact that there may be means of at least partially protecting the fish habitat does not negate the existence of the right.[67] An environmental right must be implied in order to fulfill the purposes of the fishing clause. Whether existing means of enforcing that right are adequate (as the State contends), or whether supplementary means must be adopted (as plaintiffs request), is a *206 separate issue to be addressed at the remedial stage of this litigation.

B
The State raises the jurisprudential defense that even if the tribes' fishing right encompasses the right to environmental protection of the fish, the correlative duty associated with that right rests with the federal government and not with the State. The State invokes Hohfeldian analysis for the proposition that the nature of a "right" is best understood in relation to its jural correlative  "duty." See Hohfeld, Some Fundamental Legal Conceptions As Applied In Judicial Reasoning, 23 Yale L.J. 16, 30-34 (1913). The thrust of the late Professor Hohfeld's discussion is to refine the concept of right by distinguishing legal relations based on right from those based on privilege, power, and immunity. As enlightening as Hohfeldian analysis may be, its application to this case is elusive at best. The scope of the implied environmental right is governed by the scope of the express fishing right whose purpose it is designed to fulfill. There is no question that the duty correlative to the environmental right is similarly limited in scope. The issue raised here, which in no way implicates Hohfeldian analysis, is whether the duty correlative to the tribes' environmental right rests exclusively with the United States or whether it equally binds the State. Nowhere does Hohfeld suggest a direct correlation between the number of entities possessing a right and the number of entities subject to the duty not to violate that right.
More to the point, the Supremacy Clause imposes upon the State the duty not to violate federal rights, including those secured by federal treaties. The fact that the federal government is under a comparable duty, as a party to the treaties, not to violate the tribes' environmental right does not relieve the State of its own obligations under the Supremacy Clause. As Judge Boldt expressly held in Phase I:
"Admission of the State of Washington into the Union upon an equal footing with the original states had no effect upon the treaty rights of the Plaintiff tribes. Such admission imposed upon the State, equally with other states, the obligation to observe and carry out the provisions of treaties of the United States." Final Decision I, supra, 384 F.Supp. at 401.

C
The more difficult issues pertaining to the State's duty involve its nature and scope. Several guiding considerations emerge from the numerous cases involving disputes between states and treaty tribes. First, the treaty-secured right to take fish at usual and accustomed places may not be qualified or conditioned by the State. Puyallup I, supra, 391 U.S. at 398-399, 88 S.Ct. at 1728. See also Tulee v. Washington, supra; Winans, supra; Final Decision I, supra, 384 F.Supp. at 401. Second, the State may not subordinate the fishing right to any other objectives or purposes it may prefer.
"It [the state] may not force treaty Indians to yield their own protected interests in order to promote the welfare of the state's other citizens." United States v. State of Washington, supra, 520 F.2d at 686.
See also Final Decision I, supra, 384 F.Supp. at 401-402; Sohappy v. Smith, 302 F.Supp. 899, 908 (D.Or.1969). Third, the State may affirmatively regulate treaty fishing solely for the purpose of conserving the resource. Puyallup trilogy, supra; Final Decision I, supra, 384 F.Supp. at 333-334, 342, 401-404; Sohappy v. Smith, supra, 302 F.Supp. at 908-912. It would virtually obliterate these narrowly-drawn limitations on the State's authority were this Court to rule, by denying plaintiffs' pending motion, that the State may now regulate treaty fishing for two purposes: to conserve the resource or to destroy it.
Unlike many of the preceding cases, this case does not (at this stage of this litigation) involve an attempt by the State affirmatively to regulate the fishery. Contrary to the State's apprehensions, neither does this case involve an attempt by plaintiffs *207 to impose an affirmative duty on the State to protect the fish habitat. Rather, plaintiffs seek the recognition of a negative duty such that when the State exercises its broad regulatory powers it does not impair the environmental conditions necessary for the survival of the treaty fish. According to the United States:
"[T]he duty here is the duty to refrain from taking or approving actions which have a significant adverse impact on the treaty right fishery. Plaintiff is not seeking any new legislation or expenditure of resources by the State. It is merely asking that the State, in carrying out its regulatory authority over public or private actions with environmental impact, not authorize actions that will significantly damage or destroy the treaty guaranteed fishery."[68]
In light of this characterization of the duty sought to be imposed, the State's claim that recognition of an environmental right will require it to make additional expenditures in violation of the Tenth Amendment and National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), is ill-founded. The State need not make any additional expenditures, the treaty right from which the State's duty arises is not based on the commerce clause,[69] and the question of the appropriate scope of any relief to be granted is not yet in issue. Moreover, the State already purports to act as if it has voluntarily assumed the very duty which it here resists.
"The [Washington Fisheries] Department's habitat protection functions include evaluating potential effects of public or private projects or activities that may affect salmon production. Reports and recommendations concerning these activities are made to the appropriate agencies. * * *
Departmental functions that relate directly to habitat protection include setting restrictions for hydraulic permits, inspecting hydraulic projects, developing recommendations regarding water right applications, and establishing fish use flows for salmon production streams. * *
* * * * * *
In concert with the Department of Fisheries, the Department of Game inspects and issues joint permits for hydraulic permits. * * * [A]ctivities affecting stream beds are directed to be conducted at a time and in a manner that minimize adverse effects on the stream environment for fish. The two departments review all plans for major projects affecting stream habitat and develop appropriate recommendations. All water right applications are similarly reviewed for their possible impact on fishery resources and commented upon where needed. Recently, annual logging plans of several major timber owners have come under detailed review and comment by personnel of both departments."[70]
Whether the State effectively carries out these activities, and whether they are adequate, are questions to be addressed at the relief stage of this litigation. For present purposes it is sufficient to note that the State has at least implicitly acknowledged that it has a duty not to impair or permit the impairment of the fish habitat.
As the parties approach the relief stage, of critical concern will be the precise scope of the State's environmental duty. Plaintiffs urge the Court to hold the State to a standard of "no significant deterioration," which would preclude the State from appreciably reducing the environmental quality of the fish habitat. The State responds by *208 arguing that the cases cited by plaintiffs do not support their position.[71] The Court finds a more fundamental flaw in plaintiffs' proposal. The "no significant deterioration" standard was articulated by courts and expressly adopted by Congress in order to effectuate the goals of various environmental statutes. See Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C.1972), aff'd per curiam, 4 E.R.C. 1815 (D.C.Cir.1972), aff'd by an equally divided Court sub nom., Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973), 42 U.S.C. §§ 7470-7491 (1980) (re Clear Air Act, 42 U.S.C. § 7401 et seq.); United States Steel Corp. v. Train, 556 F.2d 822, 846 n.44 (7th Cir. 1977), 33 U.S.C. § 1313(c)(2) (re Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), 49 U.S.C. § 1653(f) (re Department of Transportation Act, 33 U.S.C. § 1651 et seq.); 43 U.S.C. § 1782(c) (re Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq.). The standard reflects Congress' legislative judgment, arrived at after weighing competing environmental and economic considerations. In each of the above-cited statutes, Congress indicated that the nondegradation standard was necessary in order to realize the statutory objectives. In contrast, here the Court rather than Congress is called upon to impose a nondegradation standard. It is well established that the scope of an impliedly-reserved right may not be broader than the minimal need which gives rise to the implied right. Cappaert, supra, 426 U.S. at 141, 96 S.Ct. at 2070. Thus, the scope of the State's environmental duty must be ascertained by examining the treaty-secured fishing right rather than by selecting a desirable standard that has been imposed by Congress in a different context.
The treaties reserve to the tribes a sufficient quantity of fish to satisfy their moderate living needs, subject to a ceiling of 50 percent of the harvestable run. Washington  Phase I, supra, 443 U.S. at 686-687, 99 S.Ct. at 3075. That is the minimal need which gives rise to an implied right to environmental protection of the fish habitat. Therefore, the correlative duty imposed upon the State (as well as the United States and third parties) is to refrain from degrading the fish habitat to an extent that would deprive the tribes of their moderate living needs.
The tribes' treaty allocation is currently set at 50 percent of each harvestable run. Id. That the ceiling has been applied creates the presumption that the tribes' moderate living needs exceed 50 percent and are not being fully satisfied under the treaties. As the burden is upon the State to demonstrate to the Phase I court that the tribes' needs may be satisfied by a lesser allocation, the State must also bear the burden in Phase II to demonstrate that any environmental degradation of the fish habitat proximately caused by the State's actions (including the authorization of third parties' activities) will not impair the tribes' ability to satisfy their moderate living needs. Naturally, the plaintiffs must shoulder the initial burden of proving that the challenged action(s) will proximately cause the fish habitat to be degraded such that the rearing or production potential of the fish will be impaired or the size or quality of the run will be diminished.

V
Accordingly, IT IS HEREBY ORDERED that the plaintiffs' motion for summary judgment on the hatchery issue is GRANTED, that the defendant's cross-motion for summary judgment on the hatchery issue is DENIED, and that the plaintiffs' motion for partial summary judgment on the environmental issue is GRANTED. Plaintiffs shall prepare and lodge with the Court by October 15, 1980, an appropriate form of order approved by defendants in accordance with the findings of fact and conclusions of law set out in this opinion.
NOTES
[1] Article III, Treaty of Medicine Creek, 10 Stat. 1133 (1855). The balance of Article III is as follows:

"* * * and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: Provided, however, That they shall not take shell fish from any beds staked or cultivated by citizens."
[2] Articles identical or substantially identical to Article III of the Treaty of Medicine Creek are contained in the Treaty of Point Elliott, 12 Stat. 927 (1859), the Treaty of Point No Point, 12 Stat. 933 (1859), the Treaty with the Makah (Treaty of Neah Bay), 12 Stat. 939 (1859), the Treaty with the Yakimas, 12 Stat. 951 (1859), and the Treaty with the Quinault (Treaty of Olympia), 12 Stat. 971 (1859).

The following tribes, or their predecessors in interest, were parties to the treaties and have intervened in this litigation: Muckleshoot, Nisqually, Puyallup, Squaxin Island (Treaty of Medicine Creek); Lummi, Nooksack, Sauk-Suiattle, Stillaguamish, Suquamish, Swinomish, Tulalip, Upper Skagit (Treaty of Point Elliott); Lower Elwha Band of Clallam, Port Gamble Band of Clallam, Skokomish (Treaty of Point No Point); Makah (Treaty of Neah Bay); Yakima (Treaty with the Yakimas); Hoh, Quileute, and Quinaults (Treaty of Olympia). United States v. State of Washington, 384 F.Supp. 312, 349 (W.D.Wash.1974) ("Final Decision I"), aff'd 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); United States v. State of Washington, 459 F.Supp. 1020, 1039-1042 (W.D.Wash.1974-1978) ("Post-Trial Decisions"), various appeals dismissed, 573 F.2d 1117 (9th Cir. 1978), 573 F.2d 1118 (9th Cir. 1978), 573 F.2d 1121 (9th Cir. 1978), decisions at 459 F.Supp. 1020, 1097-1118 (W.D.Wash.1977-1978), aff'd sub nom. Puget Sound Gillnetters Ass'n v. United States District Court for the Western District of Washington, 573 F.2d 1123 (9th Cir. 1978), aff'd in part, vacated in part, and remanded sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) ("Washington  Phase I").
Although the Makah Tribe and the Yakima Nation were organized entities prior to the negotiation of the treaties, many of the "tribes" were actually loose aggregations of individuals and the federal officials deemed them to be tribes and appointed "chiefs" for the purpose of negotiating the treaties. Washington  Phase I, supra, 443 U.S. at 664 n.5, 99 S.Ct. at 3064 n.5.
[3] The other six cases, in chronological order, are: United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); Seufert Bros. Co. v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1918); Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) ("Puyallup I"); Department of Game v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) ("Puyallup II"); Puyallup Tribe v. Department of Game, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) ("Puyallup III").
[4] Initially, the United States brought suit on behalf of the Hoh, Makah, Muckleshoot, Nisqually, Puyallup, Quileute, and Skokomish tribes. Subsequently, those tribes and the following others intervened as plaintiffs on their own behalf: Duwamish, Jamestown Band of Clallam, Lower Elwha Samish, Sauk-Suiattle, Snohomish, Snoqualmie, Tulalip, Upper Skagit River, Tulalip, and Yakima.

The defendants are the State of Washington ("State"), the Washington Department of Fisheries ("Fisheries"), the Washington Game Department ("Game"), their respective directors, and the Washington Reef Net Owners Association. Numerous agencies and interested organizations have participated actively as amici curiae.
[5] The fish covered by the treaties include the chinook, chum, coho, pink, and sockeye species of salmon as well as steelhead trout. Those who fish for salmon do so primarily for commercial purposes and are subject to regulation by Fisheries; steelhead trout are sought primarily by recreational fishermen, subject to Game's regulatory authority. The five salmon species and steelhead trout will be referred to collectively, unless otherwise noted, as "fish" or "salmon."
[6] The geographical area that is the subject of the treaties and this litigation is "that portion of the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area, * * * [including] the American portion of the Puget Sound watershed, the watersheds of the Olympic Peninsula north of the Grays Harbor watershed, and the offshore waters adjacent to those areas. Final Decision I, supra n.2, 384 F.Supp. at 328.
[7] Final Decision I, supra n.2, 384 F.Supp. at 328, 344-345.
[8] "Because of the great abundance of fish and the limited population of the area, it simply was not contemplated that either party would interfere with the other's fishing rights. The parties accordingly did not see the need and did not intend to regulate the taking of fish by either Indians or non-Indians, nor was future regulation foreseen." Washington  Phase I, supra n.2, 443 U.S. at 668, 99 S.Ct. at 3065, citing Final Decision I, supra n.2, 384 F.Supp. at 334, 355, 357.
[9] The many facts regarding the construction of these treaties which were found and affirmed on appeal in Phase I are binding on the parties in this second phase of the case. Puget Sound Gillnetters, supra n.2, 573 F.2d at 1129; Post-Trial Decisions, supra n.2, 459 F.Supp. at 1094 (Memorandum Decision Denying Disqualification).
[10] Salmon (including steelhead trout), the fish covered by these treaties, are anadromous fish. They hatch in fresh water, spend their adult lives in the ocean, and then return to their native fresh-water streams to spawn and die. Washington  Phase I, supra n.2, 443 U.S. at 662-663, 99 S.Ct. at 3062-3063. Steelhead trout may return to spawn more than once before dying.
[11] The oft-quoted statement of Governor Stevens to the Indians negotiating the Treaty of Point-No-Point epitomizes this fact:

"Are you not my children and also children of the Great Father? What will I not do for my children, and what will you not for yours? Would you not die for them? This paper is such as a man would give to his children and I will tell you why. This paper gives you a home. Does not a father give his children a home? * * * This paper secures your fish? [sic] Does not a father give food to his children?" Washington  Phase I, supra n.2, 443 U.S. at 667 n.11, 99 S.Ct. at 3065 n.11.
[12] Id. at 664, 99 S.Ct. at 3063.
[13] When Final Decision I was issued in 1974, there were approximately 794 Indian fishermen and 6,600 commercial fishermen in the case area. By way of contrast, there were 283,650 sport fishermen. Final Decision I, supra n.2, 384 F.Supp. at 387. See also Washington  Phase I, supra n.2, 443 U.S. at 664, 99 S.Ct. at 3063.
[14] As of August, 1974, Indians harvested 89,402 salmon and non-Indian commercial fishermen harvested 3,628,513 during the 1974 season. Post-Trial Decisions, supra n.2, 459 F.Supp. at 1032 (Decision, Injunction and Order re State Court Injunctions).
[15] Final Decision I, supra n.2, 384 F.Supp. at 406-407.
[16] Id. at 358.
[17] Id. at 389.
[18] Id. at 388, 403-404. See also Washington  Phase I, supra n.2, 433 U.S. at 668-669, 99 S.Ct. at 3065-3066.
[19] In Final Decision I, Judge Boldt's consideration of the hatchery issue was limited to the question whether hatchery-bred steelhead trout should be excluded from the allocation. That question had been raised, but not answered, in Puyallup II, which concerned the application of the treaties' fishing clause to the State's attempts to regulate steelhead trout fishing. The hatchery issue thus entered this litigation collaterally, as a spin-off from Puyallup II, and was later broadened by the parties here to the question whether all hatchery-bred fish should be excluded from the allocation. See Post-Trial Decisions, supra n.2, 459 F.Supp. at 1072 (Memorandum Decision and Order Granting Preliminary Injunction re Hatchery Propagated Fish).
[20] The Ninth Circuit held that fish taken offshore by non-Washington citizens should not be considered in calculating an equitable adjustment to the tribes' share. United States v. State of Washington, supra n.2, 520 F.2d 676, 689, 693 (9th Cir. 1975).
[21] Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson, 89 Wash.2d 276, 571 P.2d 1373 (1977); Purse Seine Vessel Owners Ass'n v. Moos, 88 Wash.2d 799, 567 P.2d 205 (1977); Puget Sound Gillnetters Ass'n v. Moos, 88 Wash.2d 677, 565 P.2d 1151 (1977). These cases stymied Fisheries' attempts to implement Judge Boldt's decision; Game had not even attempted to adopt implementing regulations. The various efforts by the State courts, State agencies, and interested organizations to undermine and nullify Judge Boldt's rulings (and the Ninth Circuit's affirmance thereof) were described by the Ninth Circuit as "the most concerted official and private efforts to frustrate a decree of a federal court witnessed in this century," save for some desegregation cases. Puget Sound Gillnetters, supra n.2, 573 F.2d at 1126. See generally id. at 1128-1130; Washington  Phase I, supra n.2, 443 U.S. at 672-674, 99 S.Ct. at 3067, 3068.
[22] Post-Trial Decisions, supra n.2, various appeals dismissed, 573 F.2d 1117 (9th Cir. 1978), 573 F.2d 1118 (9th Cir. 1978), 573 F.2d 1121 (9th Cir. 1978), decisions at 459 F.Supp. 1097-1118, aff'd sub nom. Puget Sound Gillnetters, 573 F.2d 1123 (9th Cir. 1978).
[23] Joint Statement of Issues, ¶ I.1 (June 23, 1978). See also ¶¶ III.1-7.
[24] Id. ¶ I.4. See also ¶¶ I.5-6, III.8, and IV.1-2.
[25] The State moved to strike all or portions of eight of the nine affidavits submitted by plaintiffs. The State objects to Alan Stay's affidavit on the ground that it does not lay a proper foundation for the government report attached thereto. Plaintiffs filed two affidavits of Mr. Stay. One, dated January 21, 1980, identifies an attached document. The other, dated March 7, 1980, summarizes data he received from the Northwest Indian Fisheries Commission. In response to the State's motion to strike, the plaintiffs withdrew the latter Stay affidavit and replaced it with the affidavit of Michael Grayum, Assistant Director for Fishery Management Services of the Northwest Indian Fisheries Commission. Although this substitution of affidavits does not address the State's objections to the first Stay affidavit, the Court independently denies the motion to strike that affidavit. The attached document is adequately authenticated and therefore admissible for purposes of the summary judgment motion. The State objects to plaintiffs' remaining affidavits (i. e., those of Howard Carlisle, Donald Chapman, Howard Droker, William Hershberger, Barbara Lane, Peter Larkin, and Phillip Mundy) on the grounds that they are not relevant or material (insofar as they pertain to historical events or environmental conditions), are not competent (insofar as the affiants state their own opinions), and are speculative (insofar as conclusions are not supported by facts). The Court denies the State's motion to strike these affidavits. The objections generally lack merit and, to the extent that they are meritorious, the affidavits need not be striken. Specifically, the Court overrules the State's relevance objection. The historical and environmental information is relevant to determining the relationship between hatchery-bred fish and the wild fish that are indisputably subject to the treaty. The State's competency objection is overruled because the relevant affiants are experts. The State's strongest argument is that plaintiffs' affidavits lack sufficient factual support. However, this does not call for the striking of the affidavits because the parties' posthearing submissions adequately supplement the factual bases underlying the material facts stated in the affidavits. Moreover, many of the objected-to statements in plaintiffs' affidavits do not pertain to facts material to the resolution of the hatchery issue. All parties agreed at oral argument that there are no genuine issues of material fact precluding resolution of the hatchery issue by way of summary judgment. Finally, the Court has relied on plaintiffs' affidavits only as and where they are cited herein.
[26] In Puyallup I, supra n.3, the Supreme Court held that off-reservation treaty fishing is subject to State regulation, limited to "nondiscriminatory measures for conserving fish resources." Id., 391 U.S. at 399, 88 S.Ct. at 1729. The case was remanded to the State courts, giving rise to Puyallup II, for the determination of whether the challenged regulation (a ban on set net fishing) was necessary for conservation purposes and whether it was nondiscriminatory. The State courts upheld the regulation, 80 Wash.2d 561, 497 P.2d 171 (1972), but the Supreme Court struck it down as discriminatory "because all Indian net fishing is barred and only hook-and-line fishing entirely preempted by non-Indians, is allowed." Puyallup II, supra n.3, 414 U.S. at 48, 94 S.Ct. at 333. The case was again remanded to establish a formula for apportioning the steelhead fishery between Indians and non-Indians. The State courts held that the state could regulate tribal fishing on as well as off of the reservation, and a limitation was imposed on the number of steelhead trout that treaty fishermen could catch each year. 86 Wash.2d 664, 548 P.2d 1058 (1976). The Supreme Court held that although the tribe was immune from suit under the doctrine of sovereign immunity, the individual members of the tribe were proper parties and were subject to regulation by the state both on as well as off of their reservation. Puyallup III, supra n.3.
[27] The first salmon hatchery in Washington was built in 1895 and the first steelhead trout hatchery activity commenced in 1903. Plaintiffs' fact statement 27, defendants' fact statements 23.3 and 14.1, and corresponding admissions thereof. (The fact statements and admissions are contained in the parties' Manual § 3.30 briefs. Each side presented its own statement of facts and legal contentions, to which the other side responded by admission, denial, or objection.)
[28] See generally defendants' fact statements 15, 20, 23, 28, 31 (including subparts) and 21.6, and corresponding admissions.
[29] Defendants' fact statements 15.15 and 23.8-23.9, and corresponding admissions.
[30] Defendants' fact statement 27.3 and corresponding admission. The 16 full-scale hatcheries in the case area are called primary units and they "have the capacity to collect, hold and spawn adults, to incubate eggs, and to hatch and rear juvenile salmon." The other 16 facilities are satellites of each of the primary units and they have "racks, rearing and/or holding ponds." Defendants' fact statements 27.2-27.3, and corresponding admissions.
[31] Although the record does not presently establish, beyond dispute, the precise share of the federal and local contributions to the State's hatchery program, the fact of such contributions is undisputed. See State's proposed stipulation of facts § III, and plaintiffs' response to Court's request for additional information at 17-23. (At the hatcheries hearing on April 10, 1980, the Court directed the parties to submit a supplementary stipulation of facts in response to three specific questions. Each side subsequently filed a separate response. With respect to the first and second questions, the parties are in substantial agreement. The plaintiffs have not responded to the third question because they claim to lack the requisite data. The discrepancies between the parties' submissions do not preclude summary judgment because there is no dispute regarding the relevant use of the data  to illustrate the patterns and trends characterizing the State's hatcheries program. For the purposes of the plaintiffs' motion for summary judgment, all real and apparent factual disputes are resolved herein in favor of the State.)
[32] State's proposed stipulation, § II (as amended by letter of August 15, 1980), and plaintiffs' response, Table II-1.
[33] Supplemental affidavit of Robert Hager, attachment 2, at 3.
[34] State's proposed stipulation, § II (as amended by letter of August 15, 1980), and plaintiffs' response, Table II-1.
[35] Id.
[36] Plaintiffs' fact statements 191, 194, and corresponding admissions.
[37] Defendants' fact statement 8 (and subparts), and corresponding admissions.
[38] Id., especially defendants' fact statements 8.2, 8.3, and 8.5, and corresponding admissions, denials, and explanatory comments.
[39] Defendants' brief of March 7, 1980, re hatchery fish summary judgment at 3.
[40] Washington  Phase I, supra n.2, 443 U.S. at 668-669, 99 S.Ct. at 3065-3066; Post-Trial Decisions, supra n.2, 459 F.Supp. at 1079-1080 (hatchery injunction); Final Decision I, supra n.2, 384 F.Supp. at 334, 353 (¶ 13.3). See also section V.A., infra.
[41] Affidavit of Howard Droker at 8, quoting State publication entitled "Salmon Hatcheries."
[42] Droker affidavit at 5, quoting speech by Jack Hurley. See generally Droker affidavit.
[43] State's proposed stipulation, § I (plaintiffs contend that accurate data from which to compute accurate percentages is not available. Plaintiffs' response at 9).
[44] Affidavit of Jack Ayerst, attachment 1, at 3, 19 (emphasis added).
[45] "Indian treaty rights * * * secures [sic] so much as * * * is necessary to provide the Indians with a livelihood  that is to say, a moderate living." Washington  Phase I, supra n.2, 443 U.S. at 686, 99 S.Ct. at 3075.
[46] Plaintiffs claim that the easterners who negotiated the treaties on behalf of the United States would have known about the decline of the Atlantic salmon fishery and the introduction of hatcheries in the East. However, the only support for this contention are some highly-speculative comments of anthropologist Barbara Lane, who in turn relied primarily on one book written by a Canadian in 1856. See Lane affidavit at 3-4. This material is insufficient to raise a genuine dispute of fact or to require reconsideration of the Supreme Court's finding that "[b]ecause of the great abundance of fish and the limited population of the area, it simply was not contemplated that either party would interfere with the other's fishing rights." Washington  Phase I, supra n.2, 443 U.S. at 668, 99 S.Ct. at 3065. Cf. affidavit of Anthony Netboy at 5-6.
[47] Plaintiffs' fact statements 111-117, 120-121, 137-138, defendants' fact statements 10.1-10.5, 11.3, and corresponding admissions.
[48] Lane affidavit at 7-10. In contrast to Dr. Lane's conjectural remarks regarding the eastern negotiators' knowledge of hatchery facilities (e. g., they "likely knew" (at 4), "it is reasonable to assume" (at 7)), her statements regarding the Indians' customs are more solidly based, more squarely within her expertise, and more closely akin to her reports and testimony which Judge Boldt praised and on which he expressly relied in Phase I. See Final Decision I, supra n.2, 384 F.Supp. at 350 and passim. Although the State purports to deny plaintiffs' fact statements 118-119 regarding the Indians' property concepts applicable to migratory fish, the State provides no supporting facts sufficient to contradict the Lane affidavit or to raise a genuine dispute as to this fact.
[49] Plaintiffs' fact statements 122, 124, and corresponding admissions.
[50] Defendants' bare denial of plaintiffs' fact statement 130 is insufficient to create a genuine dispute in light of plaintiffs' supporting material in the Lane affidavit at 8-9.
[51] Lane affidavit at 9.
[52] See defendants' brief of March 7, 1980, re hatchery fish summary judgment at 11-14; defendants' legal contentions III (and subparts).
[53] Instead of the 50/50 basis for allocating treaty fish between tribal and nontribal fishermen, the State would allocate hatchery fish on an equal opportunity basis. The Supreme Court has consistently rejected the equal opportunity approach to allocation under the treaties. Washington  Phase I, supra n.2, 443 U.S. at 679-685, 99 S.Ct. at 3071-3074, and cases cited therein.
[54] Defendants' brief of March 7, 1980, re hatchery fish summary judgment at 13.
[55] See supra n.31.
[56] State's proposed stipulation, § II (as amended by letter of August 15, 1980), and plaintiffs' response, Table II-1.
[57] Plaintiffs have suggested that the declaratory judgment sought in connection with this motion may, as a practical matter, dispose of the entire environmental issue regardless of in whose favor that judgment is entered. Plaintiffs seek only prospective relief and, in light of the State's pledge to abide by the ruling in this case, implementation of a declaratory judgment may well resolve the underlying dispute without the necessity of further court proceedings.
[58] United States Fish and Wildlife Service, Washington Department of Fisheries, and Washington Department of Game, Joint Statement Regarding the Biology, Status, Management, and Harvest of the Salmon and Steelhead Resources of the Puget Sound and Olympic Peninsular Drainage Areas of Western Washington (1973) ("Joint Biology Statement") at 17.
[59] Id.
[60] Id. at 20, 78.
[61] The Supreme Court's use of the term "harvestable" in describing the population of allocable fish did not, contrary to the State's contention, put the tribes at the mercy of any and all, natural and man-made, fluctuations in the resource. The term simply differentiates between the total fish population and those fish subject to allocation under the treaty. The remainder must escape for spawning purposes in order to perpetuate the resource. Washington Phase I, supra n.2, 443 U.S. at 670 n.15, 99 S.Ct. at 3067 n.15.
[62] Defendants' brief on motion for partial summary judgment (Mar. 31, 1979) at 23-48.
[63] United States v. Winans, supra n.3 (re fish wheel).
[64] Tulee v. Washington, supra n.3 (re fishing license fee).
[65] Puyallup II, supra n.3 (re ban on all-Indian net fishing in favor of all-non-Indian hook-and-line fishing).
[66] Final Decision I, supra n.2, 384 F.Supp. at 388-399, 403-404 (re discriminatory enforcement of Washington's fishing regulations).
[67] Colville Confederated Tribes v. Walton, 460 F.Supp. 1320 (E.D.Wash.1978), is not to the contrary. There, Judge Neill declined to find an implied reservation of water in order to protect Lahontan trout spawning grounds on the Colville Indian Reservation. The record established that although power and reclamation dams eliminated natural spawning grounds, a federally-operated hatchery made replacement trout available to the tribe and the tribes' fishing right was not shown to be impaired. Therefore, it was not necessary to imply an environmental right in order to fulfill the purposes for which the Colville Reservation was created. Id. at 1330. Here, the record establishes beyond dispute that environmental degradation has impaired the fish habitat. Moreover, there is no showing that hatchery programs have fully mitigated the resulting diminution in the fishery. The recognition of an implied environmental right is essential to the tribes' exercise of their fishing right; the extent of such right will later be determined in light of the adequacy of existing environmental protection and artificial propagation programs.
[68] Plaintiffs' response to defendants' brief on motion for summary judgment at 12 (United States' reply brief). See also plaintiff tribes' reply memorandum re: plaintiffs' motion for summary judgment at 37 n.14.
[69] The Supreme Court's holding in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), has been limited to federal attempts under the commerce clause to impose affirmative monetary obligations on states. See Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690 n.54, 98 S.Ct. 2018, 2035 n.54, 56 L.Ed.2d 611 (1978).
[70] Joint Biology Statement at 75-76, 90.
[71] Having denied the existence of any environmental right or any environmental duty upon the State, the State does not propose an alternative definition of the scope of plaintiffs' asserted right.