UNITED STATES of America, et al.,
Plaintiffs-Appellees,

v.

STATE OF WASHINGTON, et al.,
Defendants-Appellants.

No. 81–3111.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1982.

Decided Nov. 3, 1982.

As Amended Jan. 3, 1983.

Edward B. Mackie, Deputy Atty. Gen., Olympia, Wash., for defendants-appellants.

William A. White, Washington, D.C., for plaintiffs-appellees.

Alan C. Stay, Seattle, Wash., for amicus curiae Hoh/Quileute/Nugually Tribe.

Before SNEED, ANDERSON, and RE-INHARDT, Circuit Judges.

SNEED, Circuit Judge:

## I.

## OVERVIEW

In this case the State of Washington ("the State") appeals the grant of summary judgment in the second phase of this protracted litigation over Indian treaty fishing rights in the Pacific Northwest. The district court characterized its opinion as "but the most recent link in a long chain of opinions construing the following 27 words:

'The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory ...'."

*United States v. Washington,* 506 F.Supp. 187, 189 (W.D.Wash.1980). The district court held that hatchery fish are included in the fish to be apportioned by the treaty. The court further held that the right of taking fish incorporates the right to have treaty fish protected from environmental degradation. Thus, the treaties impose upon the State of Washington a duty to refrain from degrading or authorizing the degradation of the fish habitat to an extent that would deprive the treaty Indians ("the Tribes") of their moderate living needs.

On review of a grant or denial of summary judgment, the standard we apply is whether, viewing the evidence in the light most favorable to the party against whom summary judgment is granted, the district court correctly found that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 775 & n. 2 (9th Cir. 1981); *SEC v. Murphy,* 626 F.2d 633, 640 (9th Cir. 1980). Our review is identical to that of the district court. *State ex rel. Edwards v. Heimann,* 633 F.2d 886, 888 n. 1 (9th Cir. 1980).

We find that hatchery fish are included in the fish that Indians have the right to take "in common with" non-Indian fishermen in Washington. The treaties do not, however, guarantee an adequate supply of fish to meet the Tribes' moderate living needs. Nor do they create an absolute right to relief from all State or State-authorized environmental degradation of the fish habitat that interferes with a tribe's moderate living needs. Rather, we find that when considering projects that may have a significant environmental impact, both the State and the Tribes must take reasonable steps commensurate with the respective resources and abilities of each to preserve and enhance the fishery.[1] Both share in the beneficial use of a fragile resource. Each to the other owes this obligation.

## II.

## BACKGROUND

This suit was commenced in 1970 by the United States on its own behalf and as trustee of seven Indian tribes. It was bifurcated for trial into separate parts or "phases." *United States v. Washington,* 384 F.Supp. 312, 327–28 (W.D.Wash.1974) (Boldt, J.) ("*Final Decision I*"), aff'd, 520 F.2d 676 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Washington,* 459 F.Supp. 1020 (W.D. Wash.1974–1978) ("*Post-Trial Decisions*"), *various appeals dismissed,* 573 F.2d 1117 (9th Cir. 1978), 573 F.2d 1118 (9th Cir. 1978), 573 F.2d 1121 (9th Cir. 1978), decisions at 459 F.Supp. 1020, 1097–1118 (W.D.Wash.1977–1978), *aff'd sub nom. Puget Sound Gillnetters Association v. United States District Court,* 573 F.2d 1123 (9th Cir. 1978), *aff'd in part, vacated in part, and remanded sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) ("*Fishing Vessel*"). Phase I addressed whether the fishing clause appearing in six treaties[2]

---

1. The State's obligation derives from the obligation of the United States under the treaty. *See infra* note 2. Presumably the United States, although not a defendant in this lawsuit, is subject to an equivalent duty to take reason-
able steps commensurate with its resources and abilities to preserve and enhance the fishery.

2. *See United States v. Washington,* 506 F.Supp.

negotiated by Governor Isaac Stevens between the United States and several Pacific Northwest Indian tribes in 1854 and 1855 ("the treaty" or "the treaties") entitles the Indians to a specific allocation of the salmon and steelhead trout in the treaty area. The geographical region affected by the treaties comprises the State of Washington west of the Cascade Mountains and north of the Columbia River drainage area, including the American portion of the Puget Sound watershed, the watersheds of the Olympic Peninsula north of the Grays Harbor watershed, and the offshore waters adjacent to those areas ("the case area"). 506 F.Supp. at 190 n. 6. The Supreme Court concluded that "[b]oth sides have a right, secured by treaty, to take a fair share of the available fish. . . . [and] an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a 'usual and accustomed' place into approximately equal treaty and non-treaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount." *Fishing Vessel,* 443 U.S. at 684–85, 99 S.Ct. at 3073–74.

The plaintiffs-appellees formally initiated Phase II in 1976 by filing amended and supplemental complaints. Phase II addresses whether artificially-propagated hatchery fish are included in the allocable fish population, and whether the right of taking fish incorporates the right to have the treaty fish protected from environmental degradation.[3] After extensive discovery and pretrial preparation, the plaintiffs-appellees moved for partial summary judgment on the issue of the environmental right.[4] The parties filed cross-motions for summary

judgment on the hatchery issue. The district court, as already noted, held that the hatchery fish were includible and that treaty fish were protected from environmental degradation.

### III.

### DISCUSSION

#### A. *The Hatchery Issue*

##### 1. *The district court's holding.*

At the summary judgment hearing in the court below, the State argued that the "first generation" of hatchery-produced fish should be excluded from the allocation. It conceded that subsequent generations, which spend their entire life cycle in the natural environment, are part of the allocable population. The district court rejected the State's position. It held that all hatchery fish must be included in the computation of shares "in order to effectuate the parties' intent and the purposes of the fishing clause." 506 F.Supp. at 197. The court mustered support for that result from (1) its interpretation of *Fishing Vessel;* (2) its inability to discern any recognized limitations on the Indian right to take fish on the basis of fish species or origin; (3) the role that non-Indian commercial fishing and non-Indian degradation of fish habitat played in causing the natural fishery's decline; (4) the fact that the State hatchery program was established to replace natural fish that were "artificially" lost; and (5) the practical effect of excluding what constitutes an ever-increasing proportion of the case fish population from the treaty allocation area.[5] *Id.* at 197–99. Thus, the dis-

---

187, 189 n. 2 (W.D.Wash.1980). These treaties bind the State of Washington under the Supremacy Clause, U.S. Const. art. VI, cl. 2, which imposes upon the states the obligation to observe and carry out the provisions of treaties of the United States. 506 F.Supp. at 206; *United States v. Washington,* 384 F.Supp. 312, 401 (W.D.Wash.1974) (Boldt, J.) ("Final Decision I").

3. 506 F.Supp. at 191. The district court also retains jurisdiction to implement the allocation decreed in *Fishing Vessel. Id.*

4. Excluded from the scope of that motion, and hence not before us on this appeal, are two subsidiary environmental issues: whether, if an environmental right exists, the State has violated it; and what remedies, if any, are appropriate. 506 F.Supp. at 194.

5. Hatchery activities have steadily increased, particularly in recent years. Hatchery fish now account for as much as 63% of runs of some kinds of anadromous fish, although other runs are entirely natural. After release from hatcheries, hatchery-bred fish mature and reproduce

trict court held that hatchery fish are "fish" under the treaty regardless of whether they originate in State, Indian, or federal hatcheries, or from cooperative ventures. 506 F.Supp. at 202.

The district court, in interpreting the Supreme Court's resolution of the Phase I allocation question in *Fishing Vessel,* considered the hatchery fish issue as virtually decided by that case as well. To quote the district court, "[t]he Supreme Court's recent reaffirmation of the longstanding view that the treaties were designed to guarantee the tribes an adequate supply of fish goes far toward resolving the hatchery issue." 506 F.Supp. at 197. While we reach the same conclusion as the district court on the hatchery fish issue, we differ with its interpretation of *Fishing Vessel.* Because that difference is fundamental to understanding our position in this case, we set it forth here.

In *Fishing Vessel,* the Supreme Court held that the fishing clause gives the Indians more than equal access to the fishing grounds. Under the unforeseen circumstances of relative scarcity, the treaty right entitles the Indians to an allocation of up to fifty percent of the harvestable fish runs that pass through their usual and accustomed fishing places, subject to reduction if the Indians' moderate living needs can be satisfied with less. *Fishing Vessel,* 443 U.S. at 686–87, 99 S.Ct. at 3074–75. The Court did not say that the treaty right guarantees

the Indians that there will always be an "adequate supply of fish." Compare 443 U.S. at 686 & n. 27, 99 S.Ct. at 3075 & n. 27 with 506 F.Supp. at 197. Nor did *Fishing Vessel* say that the treaty guarantees them a means by which their moderate living needs can be met by fishing in perpetuity.

Although the district court qualifies its "guarantee" with an express limitation (the requirement of sharing the harvest "in common with" non-Indians) and some implicit ones,[6] we believe that these qualifications do not undo the faulty presumption inherent in the district court's "guarantee" of an adequate supply of fish—*i.e.,* that *Fishing Vessel* created a floor on Indian fishing rights as well as a ceiling. *Cf.* 443 U.S. at 686 & n. 27, 99 S.Ct. at 3075 & n. 27. As we read the Supreme Court's opinion, *Fishing Vessel* mandates an allocation of fifty percent to the Indians, subject to a revision *downward* if moderate living needs can be met with less.[7]

### 2. The State's arguments on appeal.

■ On appeal the State argues that the district court erred in relying on *Fishing Vessel* to find that hatchery fish are subject to treaty allocation; that inclusion of hatchery fish in the treaty allocation depends on the resolution of questions of material fact, making summary judgment inappropriate; and that the State is entitled to an equita-

in the same manner as natural fish and are virtually indistinguishable. 506 F.Supp. at 197.

6. The implicit limitations on the "guarantee" are the Tribes' moderate living needs, the State's power to impose conservation measures, and the physical availability of the fish. 506 F.Supp. at 198.

7. The district court's concluding paragraphs on the environmental right to protection of the fish habitat amply illustrate the problem with the court's emphasis on moderate living needs. *See* 506 F.Supp. at 208. After reciting that the treaties reserve to the tribes a sufficient quantity of fish to satisfy their moderate living needs, subject to a ceiling of 50 percent of the harvestable run, *id.,* the district court reasoned that this requirement imposes upon the State a duty to refrain from allowing the environment to worsen to an extent that would deprive the tribes of their moderate living needs. This

stands *Fishing Vessel* on its head. "Moderate living needs" is a maximum, not a minimum. *See, e.g., Fishing Vessel,* 443 U.S. at 686–87, 99 S.Ct. at 3074–75.

The Tribes have a right to at most one-half the harvestable fish in the case area. If this amount is inadequate to ensure Indian well-being, the remedy lies in Congressional action. It does not lie in the treaty right.

While environmental degradation that has a discriminatory effect on Indians is barred under *Puyallup I* if authorized or caused by the State, *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 2689 (1968), the 50% allocation standard of *Fishing Vessel* creates no right against degradation in and of itself because it sets no minimum Indian entitlement. Any right to protection from environmental degradation must therefore have its origin in a different source.

ble consideration for its hatchery contribution to the case area fishery.[8] For reasons different than the district court's, we find these arguments inadequate to justify granting the State the relief it seeks.

### a. Fishing Vessel

The State argues that the Supreme Court's opinion in *Fishing Vessel* neither requires nor suggests that hatchery fish be included in the treaty allocation. We agree that *Fishing Vessel* clearly does not *require* the inclusion of hatchery fish by virtue of its ruling on the allocation question. Moreover, the Court specifically disclaimed any intention of deciding the hatchery issue. 443 U.S. at 688 n. 30, 99 S.Ct. at 3076 n. 30. Interpreting the treaty in favor of the Indians according to established principles, the Court held that because the Indians gave up something of great value—their land—they must therefore be presumed to have obtained rights of significant value in return.[9] But because the Indians obtained *something* of value, it does not follow that they got *everything* of value pertaining to "taking fish, at all usual and accustomed grounds. . . ." Whether the intent of the parties requires including hatchery-bred fish in the allocation of fish to the Indians remained an open question after *Fishing Vessel*.

### b. Existence of questions of material fact

Production of hatchery-bred fish occurs in a number of different hatchery programs, most but not all of which are run by the State. Because each program may involve a different purpose, stream, hatchery technique, source of funding, species of fish, or effect on the natural fishery, the State argues that material issues of fact remain to be determined before a grant of summary judgment can be appropriate.[10]

The State cites the concurring opinion of Justice White in *Department of Game v. Puyallup Tribe,* 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) (*"Puyallup II "*), for the proposition that Indian treaty rights extend only to the natural fish run that the river would have, left to its own devices.[11] At a minimum, the State argues, the source of funding for the hatchery program and the size of the natural run as compared with the hatchery run must be determined before hatchery fish can be included with natural fish in the treaty allocation.

On review of this grant of a motion for partial summary judgment, all facts and reasonable inferences to be drawn from the facts must be viewed in the light most favorable to the State, and all reasonable doubts touching the existence of genuine issues of material fact must be resolved against the Tribes and the United States. *See Santos v. Scindia Steam Navigation Co.,* 598 F.2d 480, 483 (9th Cir. 1979), *aff'd and remanded,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); *Dalke v. Upjohn Co.,* 555 F.2d 245, 248 (9th Cir. 1977). However, if the district court was correct as a matter

---

8. At the hearing the State advanced several arguments in support of its position, not all of which are repeated on appeal. *See* 506 F.Supp. at 199–202.

9. Specifically, the Indians' rights are not limited to a right of equal access or equal opportunity to compete with vastly more numerous non-Indian fishermen for a share of the fish. Their rights include a right to take a specified share of the fish, set initially by the Supreme Court at fifty percent. 443 U.S. at 685, 99 S.Ct. at 3074.

10. The Tribes raise the issue of whether the State is bound by its assertion at oral argument on the summary judgment motions that there were no genuine issues of material fact precluding summary judgment. Ordinarily, an appellant may not overturn a summary judgment

by raising in the appellate court an issue of fact that was not plainly disclosed as a genuine issue in the trial court. *Von Brimer v. Whirlpool Corp.,* 536 F.2d 838, 848 (9th Cir. 1974); 6 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.27[1] at 56–1557 (2d ed. 1982). Since we decide against the State on its appeal of the grant of summary judgment, we need not decide whether it can properly argue the existence of genuine issues of material fact.

11. The concurrence stated that "the Treaty does not obligate the State of Washington to subsidize the Indian fishery with planted fish paid for by sports fishermen." 414 U.S. at 49, 94 S.Ct. at 333. However, this view had the support of only three of the Justices.

of law in finding that all hatchery-bred fish released into waters that pass through the Indians' "usual and accustomed" fishing places are subject to the treaty allocation, the factual questions raised by the State are immaterial. For reasons discussed below, we believe the district court was correct and hold that hatchery fish are "fish" for the purposes of the treaty.

### c. Equitable consideration for hatchery-bred fish

For the allocation decision in *Phase I* it was possible to rely on the express language of the treaties, as well as the parties' intentions and surrounding circumstances, in construing the treaties' fishing clause.[12] By contrast, no express terms in the fishing clause pertain to the hatchery issue. 506 F.Supp. at 194–95. Under these circumstances, the district court correctly assigned special importance to canons for interpretation of Indian treaties. These canons call for promoting the treaties' central purposes, construing treaties in the sense in which they would naturally be understood by the Indians rather than according to the technicalities of learned lawyers, resolving ambiguities to benefit the Indians, and, in short, broadly interpreting the treaties in the Indians' favor. 506 F.Supp. at 195 (quoting *Fishing Vessel,* 443 U.S. at 676, 99 S.Ct. at 3069). *See Jones v. Meehan,* 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899); *Tulee v. Washington,* 315 U.S. 681, 684–85, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942); *Seufert Bros. Co. v. United States,* 249 U.S. 194, 198, 39 S.Ct. 203, 205, 63 L.Ed. 555 (1919); *United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 663–64, 49 L.Ed. 1089 (1905). The district court then interpreted *Fishing Vessel* to create a right to an adequate supply of fish. *See supra* pp. 1376–

1377. It further found that the increasing predominance of hatchery fish would inescapably jeopardize this right if hatchery fish were excluded from the allocation. Thus, it reasoned, hatchery fish must be included.

Despite our disagreement with the district court's interpretation of *Fishing Vessel,* we concur in its observations concerning the increasing proportion of hatchery fish in the total fish population in the case area and the mitigation function of the State hatchery program. Rather than rely on *Fishing Vessel,* which expressly notes that it does not reach the hatchery issue, *see* 443 U.S. at 688 n. 30, 99 S.Ct. at 3076 n. 30, we ground our holding that hatchery fish must be included in the treaty allocation on three independent factors. These are the lack of any basis for State ownership of the fish once released, the competition .between hatchery and natural fish for the same resources in a given stream, and the mitigation function of the hatcheries.

### (1) Lack of state ownership

The Supreme Court has rejected the notion that a state owns fish swimming within its waters. *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977). The State does not seriously contest the issue of ownership, but argues that nevertheless it has greater regulatory authority over hatchery fish than over natural fish, by analogy to the developed waters doctrine.[13] We find that the State has demonstrated no legal basis for distinguishing between natural fish and hatchery fish released into public waters which pass through the usual and accustomed fishing places of the Tribes. When the State voluntarily relinquishes control over such fish by releasing them into the

---

**12.** The fifty/fifty allocation between treaty and nontreaty fishermen was derived from the "in common with" language of that clause. 443 U.S. at 686 n. 27, 99 S.Ct. at 3075 n. 27.

**13.** Under the developed waters doctrine, one who by his own efforts develops waters not otherwise available for use has a superior right to the use of those waters, even in times of drought where other appropriators have prior rights in the water system. J. Sax, *Water Law,*

*Planning and Policy* 492 (1968) (citing cases). The developed waters cases cited by the State, *see* State Brief at 72–73, are unconvincing. Indian treaty rights cannot be determined by analogy to water appropriation cases involving conflicts between private parties or between the State and a private party. In those cases, the critical factor of special protection for the Indian is absent.

public waters, they may not be excluded from the treaty allocation.

### (2) *Practicalities of the fishery*

This result gains strength when practicalities are considered. Hatchery fish compete with natural fish for food, space, and other necessities of aquatic existence. Adding hatchery fish to the natural runs may affect the harvest and escapement levels of natural fish and contribute to the decline of the natural fishery. In addition, we note that separating the hatchery contribution from the natural contribution to given fish runs is at present problematic. Hatchery and natural fish generally resemble each other, although sophisticated techniques are being developed to attempt to differentiate between them. 506 F.Supp. at 197. Thus, the division of the harvest between hatchery and natural fish is an endeavor of dubious feasibility, complicated by the need to take into account the adverse effect of hatchery fish on natural fish.

### (3) *Mitigation function of the hatcheries*

We also find it persuasive, although not dispositive, that the hatchery fish programs have largely served a mitigating function since their beginning in 1885. 506 F.Supp. at 198. Natural fish have become relatively scarce at least in part because of the commercialization of the fishing industry and the degradation of the fishing habitat caused primarily by non-Indian activity in the case area. The record establishes that the State has developed its artificial propagation program in order to replace these fish. *Id.* Under these circumstances it is just to consider such replacements as subject to treaty allocation. To share a resource in common means that any one party's contribution to the resource benefits all who share the resource.

Both the Tribes and the United States, as the district court found, contribute to the production of hatchery-bred fish. Nevertheless, the State contributes by far the largest share. The State disclosed at oral argument that it produces 86% of the coho, 65% of the chinook, 82% of the steelhead, and 65% of the chum from case area hatcheries. These figures strongly support the proposition that the State has a vital interest in preserving and enhancing the anadromous fisheries of the case area, and that it will act on that interest. After *Fishing Vessel* and our holding today, the interests of those non-Indian fishermen and the Indians, whose previous divergence has given this sometimes bitter dispute its force, are inextricably linked. Each additional fish the hatcheries produce benefits all fishermen, Indians and non-Indians alike. Thus, unless the State is to abandon the very powerful non-Indian constituency, the prospect of drastic State-caused decline in the anadromous fishing runs of the case area is unlikely.

In sum, we affirm the holding of the district court on the hatchery fish issue.

### B. *The Environmental Right*

 To the district court, *Fishing Vessel*'s holding that the Indians possess a right to a share of the fish "all but resolved" the environmental issue in favor of the Indians. 506 F.Supp. at 203. Essentially, the district court found that the Indians' right to an adequate supply of fish required that the treaty be construed to incorporate an absolute environmental protection for the fish. *Id.* at 208. Otherwise, the State could destroy the fishery, *id.* at 204, and deprive the tribes of their moderate living needs, *id.* at 208.

Since we find that the Supreme Court in *Fishing Vessel* did not consider whether the treaty guarantees the Indians an adequate supply of fish, we necessarily reject the underpinnings of the district court's decision. Moreover, we find no absolute right to any particular level of fish supply established by the treaty. To stop there, however, would be to unduly minimize the treaty obligations and ignore the natural dependence on one another of all who share the fishery and the necessity for all to work together to preserve and enhance its productive capacity. More is required to resolve adequately the issue of the environmental right. In the discussion that follows, we analyze the district court's proposed environmental right in terms of our

four main objections to it: the absence of a basis in precedent, the lack of theoretical or practical necessity for the right, its unworkably complex standard of liability, and its potential for disproportionately disrupting essential economic development. While our reasoning leads us to reverse the district court on the question of a comprehensive environmental servitude, we recognize that there exists the need to formalize the *reciprocal* obligations of the State and the Tribes toward the fishery resource which they now share. *See* 443 U.S. at 684–85, 99 S.Ct. at 3073–74 (treaty grants rights to both parties); *United States v. Washington,* 520 F.2d 676, 685, 686 (9th Cir. 1975) (analogy to co-tenants). Our approach looks toward co-operative stewardship of the anadromous fish runs.[14] We hold that in carrying out their affairs, the State and the Tribes must each take reasonable steps commensurate with their respective resources and abilities to preserve and enhance the fishery.[15]

We recognize that our interpretation of the treaty places environmental restraints on activities in the case area. We prefer this option, however, to the establishment of a comprehensive environmental servitude with open-ended and unforeseeable consequences. The approach we have taken channels the inquiry into adverse effects on treaty fish runs in a way that is more reasonable and more equitable to all.

1. *Absence of a basis in precedent.*

a. *Fishing Vessel*

The district court stated that the Supreme Court has "essentially rejected the principal assumptions underlying the State's arguments" on the environmental

issue. 506 F.Supp. at 202. This is not so. The Supreme Court in *Fishing Vessel* held that Indian treaty rights exceeded those envisioned by the equal opportunity theory. Beyond its holding that the Indians are entitled to a share of the fish, the Court did not indicate in what manner or under what circumstances this share was entitled to protection. It certainly did not adopt a comprehensive environmental servitude.

Noting that the fishing clause is the cornerstone of the treaties and possesses overriding importance to the Tribes, *see* 506 F.Supp. at 203 (citing *Fishing Vessel,* 443 U.S. at 664–67, 99 S.Ct. at 3063–65), the district court recognized that there must be fish to give value to the right to take fish. *Id.* While this truth cannot be denied, alone it does not establish that the Tribes possess an environmental right to have fish stocks maintained at current levels, previous historical levels, or economically satisfactory levels. Nor does it establish that the Supreme Court has so intimated.

Any right may be subject to contingencies which would render it valueless. Examples abound. The stock on which an option is granted may plummet in value, rendering exercise fruitless; a supplier's coal requirements contract may be frustrated when the contracting manufacturer goes out of business; an author's movie rights may prove worthless because the movie is never made; a lawyer may never collect a contingent fee because he loses the case. Each example demonstrates that an event depriving a right's exercise of its practical value does not impair *the right itself,* but merely eliminates the gain its holder hoped to realize.

---

14. We do not ignore the unfortunate history of conflict and ill-will between treaty and non-treaty fishermen in choosing this approach. Despite the difficulties of the past, we believe that the ground rules existing as of this decision—a percentage allocation of fish to the Indians with a 50% maximum, and hatchery fish included in the allocation—form a sufficiently clear and enforceable scheme to allow competing fishermen in the case area to put the dispute-ridden past behind them and proceed with a new emphasis on good faith cooperation, and protection and enhancement of the

resource. *Cf., e.g.,* E. Chaney, *A Question of Balance* 25 (1978) (possibility of coalition of Indian and non-Indian fishermen lobbying for fish protection on Columbia River).

15. The State's obligation to take reasonable steps to preserve and enhance the fishery applies to the grant of State permits as well as to the State's own projects. It does not create any independent treaty obligation on the part of private permittees. As in the ordinary case, State permittees will be required to comply with their permits under State law.

Admittedly, these examples are not entirely comparable to Indian treaty rights, because in bargaining with the United States, the Indians operated at a presumptive disadvantage in negotiating skills and in knowledge of the language in which the treaty was recorded. 443 U.S. at 675–76, 99 S.Ct. at 3069–70. However, the Supreme Court in *Fishing Vessel* considered all the relevant legal and historical implications of the Indian's unique status, *see* 443 U.S. at 675–81, 99 S.Ct. at 3069–72, and decided that the Indians had a right to fifty percent of the fish, subject to reduction if less would supply their moderate living needs. Fifty percent was a maximum, an upper limit. The Supreme Court did not state or hold that the treaty Indians were entitled to *more* than fifty percent of the fish if their reasonable living needs required more. *Id.* at 686–87, 99 S.Ct. at 3074–75.

The spectre the district court raises of tribal fishermen unprotected by the environmental right dipping their nets into the water and bringing them out empty, 506 F.Supp. at 203, cannot alter the scope of *Fishing Vessel.* Only the extension of the servitude to ban even non-discriminatory development occurring both within and without treaty fishing areas could assure against any decline in the amount of fish taken. The treaty does not grant such assurance. In its absence, losses arising from reasonable development should be borne fifty/fifty by treaty and non-treaty fishermen. This is what the Supreme Court necessarily intended by holding that the Indi-

ans are entitled to a *share* of the *available* fish, 443 U.S. at 685–87 & n. 27, 99 S.Ct. at 3074–75 & n. 27, rather than to a fixed quantity of fish.

■ A pattern of development which concentrated the adverse effects of growth on treaty fish runs and spared non-treaty runs, of course, would violate the treaty right. No special environmental right based on moderate living needs or some historic catch level need be created to remedy such a violation, however. State regulation cannot discriminate against the Indian fishery. *Puyallup II,* 414 U.S. at 48, 94 S.Ct. at 333. This principle is broad enough to encompass discriminatory granting of permits for projects with potentially adverse environmental effects.

b. *Other fishing cases*

The district court cited three other cases in support of its environmental servitude. 506 F.Supp. at 204. We read these cases as standing for more limited propositions; viz., that neither Indians nor non-Indians may fish in a way that destroys the fishery, *Final Decision I,* 384 F.Supp. at 401, and that the Indians' right of access to accustomed fishing places may not be impaired, *Confederated Tribes of the Umatilla Indian Reservation v. Alexander,* 440 F.Supp. 553, 555 (D.Or.1977).[16] In *United States v. Washington,* 520 F.2d 676, 685–86 (9th Cir. 1975), which is to the same effect as *Final Decision I,* we said that neither party may permit the subject matter of the treaties (the fish) to be destroyed by overfishing.[17]

---

16. In *Confederated Tribes,* Judge Belloni held that for the Corps of Engineers to flood Indian fishing stations with 200 feet of water would violate treaty rights, absent specific Congressional approval of the project. No general environmental right was established. The fishing stations were protected under the right to access established in *United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). 440 F.Supp. at 555–56. By contrast, the right here adopted by the district court would have prevented the construction of the dam in *Confederated Tribes* even if access to the fishing stations were retained, assuming that the Indians could have shown that the existing fish run would be damaged.

17. The district court claims that the environmental right is merely another particular application of the general principle that neither party may impair the other's fishing right. 506 F.Supp. at 204. The "previous applications" of this principle cited by the district court—impairment by physical device, *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), by license fee, *Tulee v. Washington,* 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942), by discriminatory regulation, *Department of Game v. Puyallup Tribe,* 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973) ("Puyallup II"), or by discriminatory application of neutral regulations, *Final Decision I,* 384 F.Supp. 312, 388–99, 403–04 (W.D.Wash.1974) —tellingly illustrate how much broader the en-

## c. *Reserved water rights* [18]

The implied-reservation-of-water doctrine presents a more serious problem. This doctrine has been used to safeguard Indian water rights from its inception in *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). It holds that upon the establishment of any federal reservation by withdrawal of land from the public domain for specific federal purposes, the United States "reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976). Where the purpose of establishing the reservation was to turn the Indians into an agrarian society, the amount of water impliedly reserved is that which will satisfy future as well as present needs, measured in terms of enough water to irrigate all the "practicably irrigable acreage" on the reservation. *Arizona v. California,* 373 U.S. 546, 600, 83 S.Ct. 1468, 1498, 10 L.Ed.2d 542 (1963).[19] Otherwise the purpose of creating the reservations—to enable tribes to exchange their former nomadic existence for an agricultural one—would be frustrated. *Winters,* 207 U.S. at 576, 28 S.Ct. at 211. A reservation of water for the development and maintenance of replacement fishing grounds has been implied where preservation of tribal access to fishing grounds was one purpose for the creation of the reservation, and the historic fishing grounds have been destroyed by dams. *Colville Confeder-*

ated *Tribes v. Walton,* 647 F.2d 42, 48 (9th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).

This doctrine grants Indians a priority right to necessary water that dates from the establishment of the reservation. In practice, such a right is almost always senior to any competing claims. *See* Note, *Indian Claims to Groundwater: Reserved Rights or Beneficial Interest?,* 33 Stan.L. Rev. 103, 115 (1980); F. Cohen, *Handbook of Federal Indian Law* 578 (1982). Reserved water rights may be implied only "[w]here water is necessary to fulfill the very purposes for which a federal reservation was created," and not where it is merely valuable for a secondary purpose. *United States v. New Mexico,* 438 U.S. 696, 702, 98 S.Ct. 3012, 3015, 57 L.Ed.2d 1052 (1978). However, where reserved rights are properly implied, they arise without regard to equities that may favor competing water users. *Cappaert,* 426 U.S. at 138–39, 96 S.Ct. at 2069–70. Only the amount of water necessary to fulfill the purpose of the reservation is reserved, however. *Id.* at 141, 96 S.Ct. at 2070–71.

For several reasons, the implied-reservation-of-water doctrine is inapplicable to the treaty fishing right here. The Indian treaty right to use streams in the case area for fishing does not derive from a federal reservation of land from the public domain, but is an independent grant not dependent on

vironmental right is. Three of the cited instances are direct controls on Indian fishing. The remaining case, *Winans,* more closely resembles the environmental right. Like environmental impairment, the impairment of Indian fishing rights in *Winans* can be viewed as a secondary and unintended result of a primary goal—use of the fish wheel. Even *in Winans,* however, the purpose of the non-Indian infringement was to take *fish.*

Like the district court, we interpret the treaty to apply to the building of dams, factories, and highways provided they are State-authorized. But unlike the district court, we acknowledge the danger of overreaching what the treaty fairly requires, by framing the obligation to compensate for adverse environmental impact in terms of reasonableness. *See supra,* pp. 1380–1381.

**18.** We note that the plaintiffs-appellees specifically disclaimed a reserved water rights theory of the environmental right in response to State interrogatories. State Brief at 36 n. 34. Thus, the case before us is not a reserved water rights case. The district court based its holding on the fisheries cases, citing the reserved water rights cases only for analytical support. *See* 506 F.Supp. at 204–06.

**19.** Where public lands are reserved to create a national forest, the federal government has impliedly reserved sufficient water to protect timber or to secure favorable water flows. *United States v. New Mexico,* 438 U.S. 696, 702–08, 98 S.Ct. 3012, 3015–18, 57 L.Ed.2d 1052 (1978).

the existence of a reservation.[20] In addition, the cases generally apply to a quantity of water rather than to its quality.[21] A recent Supreme Court case, moreover, narrows the scope of the doctrine, whereas the district court employs it as an analogy in creating an entirely different doctrine applicable to facts unlike those that brought forth the implied-reservation-of-water doctrine.[22] Finally, the doctrine is not necessary to the treaty's purpose of guaranteeing the Indians a fair share, as opposed to an adequate supply, of the fish. *See supra* p. 1381.

### 2. *Lack of necessity.*

This brings us to the issue whether the environmental servitude is necessary. At oral argument the Tribes contended that the hatchery issue and the environmental right were linked by the Indians' claim to hatchery fish bred as replacements for wild fish depleted by the State. We agree that the two issues are closely related, but in a way different from that which the Tribes suggest. We find that our holding on the hatchery fish substantially eliminates any theoretical or practical need for an environmental right under the treaty as interpreted in *Fishing Vessel.*

The State argues that this case should not be decided on the assumption that the State will destroy the entire fishery resource unless prevented by an environmental right. State Reply Brief at 1–10. We agree. Several important federal and state statutes enacted since the commencement of this lawsuit put increasing restraints on the State's ability to disregard adverse en-

**20.** The implied-reservation-of-waters doctrine applies only to water appurtenant to lands withdrawn from the public domain for specific federal purposes. *United States v. New Mexico,* 438 U.S. at 698, 98 S.Ct. at 3013. Where water is needed to accomplish those purposes, a reservation of appurtenant water is implied. *Id.* at 700, 98 S.Ct. at 3014; *see Colville Confederated Tribes v. Walton,* 647 F.2d 42, 46 (9th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).

While the United States withdrew lands from the public domain in order to create the Indian reservations granted by the Stevens Treaties along with explicit fishing rights, *see* 506 F.Supp. at 189–90, the waters necessary to the treaty right to take fish are not appurtenant to reservation lands in the sense required by the doctrine. Instead, the treaty fishing right and the simultaneous grant of reservation land here are essentially independent.

In *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the Supreme Court held that termination of a tribal reservation did not extinguish *hunting and fishing rights* reserved by implication in the treaty establishing the reservation. Nor did termination impair the exercise of such rights within the area of the terminated reservation. *Id.* at 411–13, 88 S.Ct. at 1710–11. Similarly, here the termination of the Indian reservations granted under the Stevens Treaties does not affect the treaty right to fish in common with other citizens. *Final Decision I,* 384 F.Supp. at 339. *See Puyallup I,* 391 U.S. at 394–95 & n. 1, 88 S.Ct. at 1726–27 & n. 1 (distinguishing reservation rights from treaty fishing rights). The treaty grants the right to fish at usual and accustomed places whether or not the surrounding lands are held in Indian title, or are within the boundaries of a reservation. *Cf. Kimball v. Callahan,* 493 F.2d 564, 569–70 (9th Cir.), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974), *and later opinion,* 590 F.2d 768, 773 (9th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979) (right to hunt, fish, and trap free of state regulation on former reservation lands survives) (rights against private landowners not adjudicated); *Cheyenne-Arapaho Tribes v. Oklahoma,* 618 F.2d 665, 668 (10th Cir. 1980) (hunting and fishing rights on allotments and tribal trust lands survive disestablishment of reservation); F. Cohen, *Handbook of Federal Indian Law* 469–70 (1982).

**21.** *See generally* F. Cohen, *Handbook of Federal Indian Law* 575–96 (1982) (citing cases). *But cf. id.* at 587 (water quality probably protected) (citing unpublished decision).

**22.** In *United States v. New Mexico,* the Supreme Court held that where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude that the United States intended to reserve it. But a contrary inference arises where water is only valuable for a secondary use of the reservation. 438 U.S. at 702, 98 S.Ct. at 3015. Thus, in setting aside the Gila National Forest from other public lands the United States was held to have reserved water sufficient to preserve the timber in the forest or to secure favorable water flows, but not for aesthetic, recreational, wildlife-preservation, and stockwatering purposes. *Id.* at 696, 98 S.Ct. at 3012. *But cf.* F. Cohen, *Handbook of Federal Indian Law* 583–84 (1982) (suggesting a broader scope for Indian reserved rights).

vironmental effects on anadromous fish. Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, § 2, 86 Stat. 816 (codified at 33 U.S.C. §§ 1251–1376 (1976 & Supp. IV 1980)); Marine Protection, Research and Sanctuaries Act of 1972, Pub.L. No. 92–532, 86 Stat. 1052 (codified at 16 U.S.C. §§ 1431–1434 (1976 & Supp. IV 1980)); Coastal Zone Management Act of 1972, Pub.L. No. 92–583, 86 Stat. 1280 (codified at 16 U.S.C. §§ 1451–1464 (1976)); Pacific Northwest Electric Power Planning and Conservation Act, Pub.L. No. 96–501, 94 Stat. 2697 (1980) (codified at 16 U.S.C. §§ 839–839h (Supp. IV 1980)); Shoreline Management Act, ch. 286, 1971 Wash.Laws 1496 (1st Exec. Sess.); Act of Mar. 20, 1973, ch. 155, § 4, 1973 Wash. Laws 457 (water pollution). *See* Blumm & Johnson, *Promising a Process for Parity: The Pacific Northwest Electric Power Planning and Conservation Act and Anadromous Fish Protection,* 11 Envtl.L. 497 (1981); Blumm, *Hydropower v. Salmon: The Struggle of the Pacific Northwest's Anadromous Fish Resources for a Peaceful Coexistence with the Federal Columbia River Power System,* 11 Envtl. L. 211 (1981). *See also* Bodi, *Protecting Columbia River Salmon Under the Endangered Species Act,* 10 Envtl. L. 349 (1980). Reckless or malicious disregard for the effects of State projects on the fishery, leading to drastic decline in the available fish, very likely would be barred under the "discriminatory regulation" standard of *Puyallup I.*[23] More importantly, it is not in the State's *interest* to allow the fish to decline. To do so injures treaty Indians and all others alike. In light of our affirmance of the district court's holding that hatchery fish must be included in the treaty fish allocation, the State's interest in preserving the fish for treaty Indians and for other fishermen is *identical.* More than a sense of responsibility toward the Indian fishermen in the case area forces the State to protect the resource. The political clout of over 6,600 non-Indian commercial fishermen and 280,000 sport fishermen, *see* 443 U.S. at 664, 99 S.Ct. at 3063, will require the State to manage the fish responsibly. After *Fishing Vessel* and our holding today, the interests of those non-Indian fishermen and the Indians, whose previous divergence has given this sometimes bitter dispute its force, are inextricably linked. Each additional fish the hatcheries produce benefits all fishermen, Indians and non-Indians alike. Thus, unless the State is to abandon the very powerful non-Indian constituency, the prospect of drastic State-caused decline in the anadromous fishing runs of the case area is chimerical.

In fact, far from disappearing, the catch of each of the five salmon species in the State of Washington (chinook, chum, pink, coho, and sockeye), while subject to fluctuation, has continued in comparative abundance from 1935 to 1970. Joint Biological Statement, Record Exhibit DH–5 at 13–16, 240. *See id.* at 204–09 (Puget Sound and case area catch). The case area chinook and coho catch has increased dramatically since 1960. Affidavit of Duane E. Phinney, Record Exhibit DH–12, attachment 8, 9. If present trends continue, the treaty fishing right which the district court characterized as "nugatory" without environmental protection, 506 F.Supp. at 203, will entitle the 800 Indian commercial fishermen in the case area to over 175,000 salmon annually. (The 6,600 non-treaty commercial fishermen and 280,000 sport fishermen will also claim 175,000 salmon from the case area).[24]

---

**23.** 391 U.S. at 398, 88 S.Ct. at 1728. It is hard to imagine such events occurring without at least a partial motivation of discriminatory animus towards the Indians.

**24.** The numbers of fishermen in the example are taken from *Fishing Vessel* and are facts found by Judge Boldt in 1974. 443 U.S. at 664, 99 S.Ct. at 3063. The figures for size of the case area salmon catch are based on the 15-year average catch of 356,997 salmon from Indian salmon fishing areas from 1957 to 1971. Joint Biological Statement, Record Exhibit DH–5 at 209.

A report prepared by the Washington Department of Fisheries, the United States Fish and Wildlife Service, and the Northwest Indian Fisheries Commission in compliance with district court orders of March 10, 1976 and December 15, 1976 in *United States v. Washington* shows the size of the 1975 salmon catch by Washington treaty and nontreaty fishermen

Both the Tribes and the United States, as we have pointed out previously, slip op. page 5203, page ——, *supra,* contribute to the production of hatchery-bred fish. This contribution by the State indicates that it has a strong interest in preserving and enhancing the fisheries of the case area. This interest, no doubt, will provide a substantial part of the mitigation of effects attributable to development. Both the United States and the Indians have emphasized mitigation as the Tribe's remedy for adverse environmental impact. They acknowledged that the environmental right would not bring all potentially adverse development in western Washington to a halt. As they see it, the right would require a project to be altered to mitigate its adverse effect, as by adding a downstream spawning channel, or by building a hatchery in the affected "usual and accustomed" fishing place.[25] The principle we adopt today, *viz.,* that the State and the Tribes must each take reasonable steps commensurate with the resources and abilities of each to preserve and enhance the fishery, resembles their proposal, with at least two important differences. First, the remedy is not tied to the Tribes' moderate living needs; second, the State must take *reasonable* steps to mitigate adverse impact on the fisheries, but has no absolute and unconditional duty under the treaty to maintain or increase existing harvest levels.

In support of tying the duty of the State to their moderate living needs the Tribes point out that the tribal rights are based not on the case area but on individual streams. If in the future the Nisqually River, for example, is dammed, the right of the Nisqually Tribe to fish in their accustomed place might well be extinguished. The Nisqually will not possess any special rights over fish from a hatchery built on a different river to replace natural fish lost. A right tied to moderate living needs would entitle them to compensation from the State or federal government equivalent to their moderate living needs so long as their fishing rights would have existed but for the building of the dam.

■ We do not find such an obligation in the treaty. Where the decision to allow development is not tinged with any discriminatory animus, the treaty fishing clause, as we read it, does not require compensation of the Indians on a make-whole basis if reasonable steps, in view of the available resources and technology, are incapable of avoiding a reduction in the amount of available fish. We recognize that the loss of a treaty stream's entire production, to take an extreme example, will affect the particular tribe using the stream more than it affects other treaty Indians and non-treaty users. Although the reduction in the aggregate available fish is borne fifty/fifty by Indians and non-Indians, the particular tribe also loses the fishing privilege that went with the stream. Assuming that the tribe cannot compete with non-treaty fish-

in the case area. The treaty and nontreaty catches of major salmon stocks by area of origin are presented in tabular form. Totalling the figures for treaty and nontreaty catches yields the result of 996,000 for the Indian catch and 6,115,000 for the non-Indian catch of case area salmon. *See* Washington State Department of Fisheries, United States Fish and Wildlife Service, & Northwest Indian Fisheries Commission, 1975 Joint Salmon Catch Report For Case Area, U.S. vs. Washington, Civil No. 9213 (February 1977). The report notes that the catch statistics presented therewith are accepted by the parties for the purpose of the report only. *Id.* at 1.

More recent data published by the Washington Department of Fisheries indicate that in Puget Sound alone the 1978 treaty-Indian commercial catch came to 1,295,366 salmon. The non-Indian fishery commercial catch in the same region was 2,394,886 salmon. Harvest Management Division, Washington Department of Fisheries, *Progress Report No. 135: Puget Sound Commercial Net Fishery Data Report for 1978* 11 (table 6) (April 1981). These figures have not been found as facts by any court, and we do not rely on them. If proven or stipulated as facts, they would of course tend to support the inference that the benefit the Indians presently draw from the treaty is not insubstantial.

25. The establishment of replacement fishing grounds through artificial propagation has been considered an acceptable mitigation of the impairment of historic fishing rights. *See Colville Confederated Tribes v. Walton,* 647 F.2d 42, 48 (9th Cir. 1981).

ermen in other waters, its fish harvest will decline by the amount of fish it used to take from the stream. The non-treaty stream users, who are better able to compete, can shift their fishing to other streams and force other non-treaty fishermen to share their loss.[26] Furthermore, treaty fishermen, faced with loss of a stream, also will lose whatever intangible cultural values they may have obtained from fishing in that particular stream. Non-treaty fishermen, who have no such intangible ties, suffer no such loss.

The unequal loss to the Indians in such a case justifies according treaty Indians a right to reasonable steps commensurate with State resources and abilities to preserve and enhance the fishery. However, to interpret the treaty to insure moderate living needs would transform a right, which is described in the treaty as one "in common with all citizens of the Territory," into a guarantee of the moderate living needs of one group of citizens, the treaty Indians. We make no forecast of how often and in what circumstances the "reasonable steps" that we require will fall short of a make-whole remedy. No doubt the requirement of "reasonable steps" will be interpreted generously. It may turn out that in the vast majority of cases "reasonable steps" are adequate to maintain historic fishing levels or give appropriate compensation. Should that not be the case it presumably will be true that the impairing development will provide great benefits to Indian and non-Indian alike.[27]

Indians share many of the materialist goals of modern non-Indians. *Final Decision I,* 384 F.Supp. at 358. Their fortunes are linked with the health of the State of Washington's economy.[28] Since Indians, as citizens, share in the benefits of economic development in the State, it is not unfair to require them to bear on infrequent occasions a portion of the costs of non-discriminatory development.

In short, we believe that the gloss that *Fishing Vessel* has put on the "in common with" language, taken together with our holding that hatchery fish are included in the treaty allocation and our "reasonable steps" requirement, equitably compensates the Indians for any loss of the ability to harvest from particular streams. Absent some showing either that those "usual and accustomed" fishing areas were discriminatorily selected for development or that reasonable steps to preserve and enhance the fishery were not taken, such losses are not precluded by the treaty.

### 3. *Unworkably complex standard of liability.*

The district court's interpretation of the treaty is also unworkably complex. The environmental right created by the district court requires the State to refrain from degrading the fish habitat to an extent that would deprive the Tribes of their moderate living needs. The district court also held that when the Tribes' treaty allocation has been set at 50 percent of each harvestable run, as currently, a presumption is created

---

**26.** For example, assume non-treaty streams *A, B, C,* and *D* each produce forty fish and support four non-treaty fishermen. Treaty stream *E* produces eighty fish, and supports one tribe and four non-treaty fishermen. Before the closing of stream *E,* each non-treaty fisherman takes ten fish, and the tribe takes forty fish. After the stream is closed, the tribe takes no fish. The four non-treaty fishermen who used to fish stream *E* begin fishing at streams *A, B, C,* and *D.* As a result, each non-treaty fisherman now takes eight fish. Both the Indians and the non-Indians have lost forty fish, but the tribe has been unable to spread its loss to the other Indians.

**27.** The district court's approach would apparently require that such benefits be foregone. For example, a power project of great value to the State might harm a particular tribe's treaty-protected run. If there were no acceptable location for hatchery development within the tribe's usual and accustomed fishing places, and the State lacked funds to pay full compensation, under the district court's interpretation the project could conceivably be enjoined.

**28.** So much so that at oral argument the State asserted that any current challenge to the 50% allocation of fish to the Indians (based on need) would be futile, given the effect of Washington's depressed logging industry on Indian incomes.

that the Tribes' moderate living needs exceed 50 percent and are not being satisfied under the treaties. To establish a treaty violation under the district court's interpretation, the Tribes must shoulder the initial burden of proving that a challenged action will proximately cause the fish habitat to be degraded such that future or current runs will be diminished. If such a showing is made, the State bears the burden of demonstrating that any environmental degradation of the fish habitat proximately caused by the State's actions (including the authorization of third parties' activities) will not impair the Tribes' ability to satisfy their moderate living needs. 506 F.Supp. at 208.

The remoteness in the causal chain between a potentially impairing project and a reduced fish harvest is an inevitable feature of any environmental protection under the treaty, as is the difficulty of separating out the effects of different projects, all of which may affect the fish runs. However, by tying the environmental right to moderate living needs, the district court further complicates the inquiry. Not only will the trial court have to assess the difficult issue of causation, but when some proximately caused diminution of the fish runs is established by the Tribes, the State will have to establish the tribe's moderate living needs and that the diminished catch will satisfy those needs. Not only would this showing have to be strong enough to overcome a contrary presumption arising from the district court's interpretation of fifty/fifty sharing, but also it would entail a consideration of fluctuations in fishery production, the economic value of the fish harvest, the income of tribes and their members, and the projected availability of fish for harvest in future years. State Brief at 58.

A state permit-issuing agency also would be required to estimate these consequences far in advance of either their occurrence or any litigation with respect to them. This time lag, in many instances of between five and ten years,[29] either would foreclose the issuance of any permit arguably affecting treaty fishing rights or would induce an administrative fatalism not distinguishable from indifference. The ultimate effect, not likely to be beneficial to either Indians or non-Indians, very possibly would be to impose on the State the burden of providing to treaty Indians an income subsidy necessary to assure their "moderate living needs." We cannot accept the view that the Stevens Treaties require this result.

### 4. Disproportionately disruptive effect.

A further word on the effect of the district court's approach on the State permit process is necessary. This process is a complex one designed by the legislature to balance state interests in environmental protection with competing state interests in allowing various types of development in different locations. The district court's interpretation of the treaty requires each permit-issuing state agency to place the highest priority on avoiding any potential impact upon fisheries that would reduce the income of tribal members. This interpretation has the potential to disrupt the existing state regulatory network much more severely than the implied-reservation-of-water doctrine has ever disrupted the system of prior appropriation of water in the Western states.[30]

The proposed environmental servitude affects *all* State or State-authorized activities affecting the environment, not just those

29. For example, if an applicant approaches the relevant state agencies in 1981 with plans for a major project, the required package of permits, including a waste discharge permit, hydraulics permit, shorelines substantial development permit, and various federal permits, will probably take until 1983 to complete. After a year or more to obtain financing and to construct the project, it would be ready for operation. Its operation would affect the out-migration of juvenile salmon the following spring. The affect-

ed salmon will be ready for harvesting two or three years later, depending on the species of fish. Thus, a project commenced in 1981 would not have its economic impact, if any, on the affected tribe until 1986 or later. State Brief at 58–59.

30. The district court relied on the implied-reservation-of-water doctrine for support by analogy of the environmental right. *See* 506 F.Supp. at 204–05; *supra* note 18.

involving appropriate consumption of water.[31] In many cases the nature of the activity conducted under State permit will make cutbacks in rights under the permit extremely difficult where required in a low-fish-harvest, low-Indian-income year. Municipal sewer discharge is an example. Furthermore, the prospect of frustrating permittee expectations under state law cautions against lightly accepting an interpretation of the treaty embodying an environmental servitude.

██ The purpose of the Stevens Treaties was to settle any and all Indian claims to land title in the case area so that non-Indian settlers could develop their lands without conflict with the Indians. State Brief at 10, 23–24; Cong. Globe, 31st Cong., 1st Sess. 262, 411 (1850). *See Final Decision I,* 384 F.Supp. at 330. It would be ironic indeed if the fishing clause in the very treaties negotiated to *eliminate* property disputes between Indians and non-Indians became the source of continual litigation over the effect of the use of non-Indian property on Indian rights. To avoid this result, the environmental right must be tempered by a reasonableness requirement such as we have recognized.

### C. *Reciprocal Obligation to Preserve and Enhance The Fishery*

Let us repeat the essence of our interpretation of the treaty. Although we reject the environmental servitude created by the district court, we do not hold that the State of Washington and the Indians have no obligations to respect the other's rights in the resource. Instead, we affirm the district court on the fish hatchery issue and we find on the environmental issue that the State and the Tribes must each take reasonable steps commensurate with the resources and abilities of each to preserve and en-

hance the fishery when their projects threaten then-existing harvest levels. *Cf. Fishing Vessel,* 443 U.S. at 684–85, 99 S.Ct. at 3073–74.

The "reasonable steps" duty we find implied by the terms of the treaty focuses on whether the State's (or the Indians') compensatory steps to protect and enhance the fishery—whether made necessary by non-fishing or fishing activities—are reasonable. Imposition of this duty to safeguard the fishery is less intrusive on the State's administrative process than would be the district court's interpretation of the treaty. In addition, a standard that evaluates whether compensatory actions to protect and enhance the fishery are reasonable is more susceptible to judicial review than would be the environmental servitude of the district court.

The detailed enforcement of the right to reasonable mitigation measures is not at issue here and must await resolution by the district court in the event that specific litigation is brought. Such suits properly belong to the relief stage of this protracted litigation. We take no position as to whether the conservation measures currently employed by the State of Washington, *see* 506 F.Supp. at 207, are sufficient to fulfill its obligations to reasonably mitigate under the treaty. That is a question whose resolution in the first instance we leave to the district court.

AFFIRMED in part, REVERSED in part.

SNEED and ANDERSON, Circuit Judges, concur in this opinion.

REINHARDT, Circuit Judge, concurring.

I concur with the majority's holding that the State of Washington,[1] when considering

---

**31.** The review required by the district court's environmental servitude would necessarily resemble in breadth the all-encompassing review for "significant environmental impact" required of "major federal projects" under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 (1976 & Supp. IV 1980) (NEPA). However, while the breadth of NEPA review is tempered by NEPA's role as a procedural stat-

ute imposing no substantive obligations on the agency carrying out the project, no such limitation exists for the environmental servitude.

**1.** As a consequence of the United States' obligation under the treaty, both the federal government and the State, on behalf of their citizens, are bound to obey the treaty's terms. Thus, each of these parties is obligated by the

projects that may have significant environmental impacts, must take reasonable steps to preserve and enhance the Indians' share of fish guaranteed by the treaty. To hold that the treaty always requires absolute protection to the complete exclusion of other vital social goals might under some circumstances lead to results that are neither sensible nor consistent with the spirit and purpose of the treaty. Nonetheless, the treaty does require that all reasonable measures be taken to preserve the share of fish to which the Indians are entitled. Thus, from a practical standpoint, I see little difference in the results that should flow from the majority's substitution of its holding for that of the district court's.

Although the majority's holding imposes appropriate duties upon the State, its opinion does not adequately explore the source or the exact nature of those duties. Nor am I in agreement with portions of its analysis or exposition.[2] The fact that the treaty does not contain absolute protections should not obscure the important obligations that the treaty does impose. At its most basic level, the treaty guarantees that the interests of the Indians are given appropriately serious consideration in the democratic process. Only through such a guarantee does the treaty's promise of fishing rights have any content whatsoever in a modern world of pollution and scarcity. As

the Supreme Court noted when interpreting the treaty,

Governor Stevens and his associates were well aware of the "sense" in which the Indians were likely to view assurances regarding their fishing rights. During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and *the Governor's promises that the treaties would protect that source of food and commerce were crucial in obtaining the Indians' assent. See supra,* at 666–668. It is absolutely clear, as Governor Stevens himself said, that neither he nor the Indians intended that the latter "should be excluded from their ancient fisheries," see n.9, *supra,* and *it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish.* That each individual Indian would share an "equal opportunity" with thousands of newly arrived individual settlers is totally foreign to the spirit of the negotiations. Such a "right," along with the $207,500 paid the Indians, would hardly have been sufficient to compensate them for millions of acres they ceded to the Territory.

*Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 676–77, 99 S.Ct. 3055, 3069–70, 61 L.Ed.2d 823 (1979) (emphasis supplied).

reasonable steps requirement imposed here. *See generally* Majority Opinion at 1375–1376 nn. 1, 2; *United States v. State of Washington,* 520 F.2d 676, 685 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (on behalf of its citizens, the State may not permit the subject matter of the treaty to be destroyed).

**2.** I am reluctant to concur in those portions of the majority opinion that are not essential to our ultimate holding. For example, the majority's discussion of the need for an environmental right is both unnecessary and potentially inaccurate. To begin with, the basic rights guaranteed by the treaty exist even if there is no present need to exercise them. Even if we assume that current environmental protections are adequate, there is no reason to believe that the Indians' rights will always be satisfactorily protected. On the contrary, the passage of time and shifts in the political balance will

inevitably alter social priorities. The fishing rights assured by the treaty must be protected against such fluctuations. In addition, the majority's view that existing environmental efforts are adequate involves complicated issues of fact and conflicting scientific opinions. There is simply not enough evidence in the record to substantiate such a holding. Because the question of whether there is a need for the treaty right to be exercised is a separate issue for the remedial phase of the litigation, Majority Opinion at 1376 n. 4, the majority should not have reached that question here.

Second, the issue of the Indians' reciprocal obligations under the treaty is not before us. We have only been asked to determine the extent of the State's duty to protect the fish supply from environmental degradation. Any discussion of the Indians' obligation must await a more detailed analysis in a case where the parties actually litigate the issue.

If it is inconceivable that the Indians would have agreed to be required to fish on the same terms as non-Indians, it is far more inconceivable that they would have allowed the State to permit the fishery to be destroyed altogether. Merely because the treaty does not provide absolute protections, then, does not mean that the rights of Indians to an equal share of fish can be subrogated to other state goals. On the contrary, the treaty guarantees that the Indians' supply of fish must be safeguarded against pollution by every reasonable means.

An examination of the State's permit process illustrates the broad outlines of the treaty's guarantee. As the majority correctly notes, the State's obligation to take reasonable steps to preserve and enhance the fishery applies to the granting of State permits as well as to the State's own projects. Majority Opinion at 1381, n. 15. In determining whether a permit should be granted for a project that may have serious environmental consequences, the treaty requires the State to give due consideration to the Indians' rights throughout the entire decision-making process. Only by affording the Indians an opportunity to fully participate in the process can the State begin to fulfill its obligations under the treaty. Once such participation has been assured, the State must first consider whether the private project is necessary in light of its probable adverse impact on the Indians' fish supply. As part of its deliberations, the State must also analyze the feasibility of alternative locations for the proposed project. Once a determination of necessity has been made, both as to the project and its location, the State is required to consider any reasonable mitigating actions that the permittee must take to avoid a reduction in the fish supply. For example, under some circumstances the establishment of replacement fishing grounds through artificial propagation may constitute an acceptable way to mitigate the impairment of historic fishing rights. *See, e.g., Colville Confederated Tribes v. Walton,* 647 F.2d 42, 48 (9th Cir. 1981). To the extent that the fish supply cannot be protected by any other reasonable means, the State may as a last resort require the permittee to pay compensation to the Indians if such compensation will minimize any adverse impacts.

As this brief description of the permit process illustrates,[3] the reasonable steps obligation imposed by the treaty guarantees that the Indians' legitimate rights will not be trampled in the political rush to satisfy other State or private goals. In short, the treaty properly interpreted should provide practical assurance that the Indians' right to a supply of fish adequate to meet their moderate living needs will be protected in one manner or another. Given the availability of alternative sites, pollution control technology, other mitigating measures, and even compensation as a last resort, our holding, if applied in the spirit required by the treaty, assures that the Indians' supply of fish will be protected by the democratic process. The treaty demands no less.

---

**3.** Because we are dealing here with only a limited aspect of the proceedings, the majority opinion is necessarily theoretical in its approach. Consequently, anything more than a brief outline of the way in which the State decision-making process should recognize the treaty obligations will have to await future litigation involving specific environmental issues.